[L. A. No. 2557.  In Bank.—October 27, 1911.]

SUNSET TELEPHONE AND TELEGRAPH COMPANY (a Corporation), and THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Appellants, v. CITY OF PASADENA (a Municipal Corporation), et al., Respondents.

MUNICIPAL CORPORATIONS—TELEPHONE COMPANY DOING INTERSTATE BUSINESS—CHARGE FOR EXCLUSIVE USE OF PORTIONS OF STREETS.— A municipal corporation has power, by ordinance, to require a telephone company, doing an interstate business, and whose lines and poles within the municipality in use in such business exclusively occupied certain portions of the public streets, to pay for the use of such streets a fixed sum per annum for each and every pole maintained therein, unless it shall have or secure a franchise or privilege therefor.

ID.—ACTS OF CONGRESS OF JULY 24, 1866—OCCUPATION OF CITY STREET BY TELEGRAPH COMPANY.—The act of Congress of July 24, 1866, entitled "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal and military purposes," did not operate to grant to a telegraph company the right to the exclusive occupation by it with poles and wires of portions of the public streets of a municipality.

ID.—INTERSTATE COMMERCE—RIGHT TO EXCLUSIVE POSSESSION OF PORTION OF STREET—ACT PROVIDING FOR GRANTING OF FRANCHISES CONSTRUED.—The mere fact that a telegraph and telephone company is engaged in interstate business and that its lines within the municipality are used in the prosecution of such business, does not give it the right to the exclusive possession of portions of the public highways in the city without its permission. That right has not

been granted to such a company, by the state, by the act of March 22, 1905, (Stats. 1905, p. 777), entitled "An act providing for the sale of street railroad and other franchises in counties and municipalities," etc.   The sole purpose of that act is to prescribe the method and conditions upon which the franchises included within its terms, which except those of steam railroads and telegraph or telephone lines doing an interstate business, might be granted by the legislative body authorized to make the grant.

ID.—SECTION 536 OF CIVIL CODE, ENACTED PRIOR TO 1905—GRANT TO TELEGRAPH COMPANIES DID NOT INCLUDE TELEPHONE COMPANIES.— Section 536 of the Civil Code, as it existed from the time of its enactment in 1872 to its re-enactment in 1905, granting to telegraph companies the right "to construct lines of telegraph along and upon any public road or highway" etc., and in such places to "erect poles . . . for supporting the insulators, wires, and other necessary fixtures of their lines," cannot be construed as granting a similar right to telephone companies—*Davis* v. *Pacific Tel. & Tel. Co.*, 127 Cal. 312, holding that the words "any line of telegraph," as used in section 591 of the Penal Code, as it existed prior to 1905, included a telephone line, is distinguished.

ID.—GRANTS BY PUBLIC STATUTES STRICTLY CONSTRUED IN FAVOR OF PUBLIC.—Grants contained in public statutes or made by public officers or public bodies are to be strictly construed in favor of the public.   This is the rule of construction incorporated in section 1069 of the Civil Code, and is applicable, especially in view of the fact that telephones were unknown at the time of the enactment of section 536 of that Code in 1872, in determining that such is the proper construction as to the extent of the grant made by the state by that section prior to its re-enactment in 1905.

ID.—CONSTRUCTION OF SAME WORD USED IN SAME STATUTE.—There is no rule of law that necessarily requires the same meaning to be given to the same word used in different places in the same statute.

ID.—USE OF CITY STREETS—MUNICIPAL AFFAIR—FREEHOLDERS' CHARTER —CONSTITUTIONAL LAW.—The question whether and to what extent the streets of a municipality shall be subjected to such secondary uses as the maintenance therein of telegraph and telephone poles and wires is a "municipal affair," as those words are used in section 6 of article XI of the constitution, as amended in 1896, making the provisions of a freeholders' charter adopted by a municipality paramount to general laws enacted by the state legislature "in municipal affairs."

ID.—CITY OF PASADENA—CONTROL OF CITY STREETS—CHARTER PROVISIONS NOT SUBJECT TO GENERAL LAWS—GRANT TO TELEPHONE COMPANIES BY SECTION 536 OF CIVIL CODE.—The freeholders' charter of the city of Pasadena, which became effective in 1901, (Stats. 1901, p. 884), confers upon the city full control of its streets, with power to determine whether and upon what terms portions thereof may be exclusively used and occupied by telegraph or telephone companies.

These matters being "municipal affairs" within the meaning of section 6 of article XI of the constitution, such charter provisions are not subject to general laws, and the re-enactment of section 536 of the Civil Code in 1905, by which certain rights in public highways were granted to telephone companies, conferred no right upon such a company so far as the streets of that city are concerned.

ID.—CONSTRUCTION OF ORDINANCE—DISCRIMINATION BETWEEN INTRASTATE AND INTERSTATE TELEPHONE COMPANIES.—An ordinance of the city of Pasadena, providing that it shall be unlawful to erect or maintain on any of the streets of the city any telegraph or telephone poles or wires for use in "doing local or intrastate business without a franchise or privilege therefor from the city" and that any person, etc., maintaining or operating upon the streets any telegraph or telephone lines or poles "doing an interstate business," shall pay semi-annually the sum of seventy-five cents per pole, unless such person, etc., shall "have or secure a franchise or privilege" therefor, is not invalid for discrimination against those engaged in interstate business. The discrimination, if any, is in favor of those engaged in interstate business, as it permits them to do such business without securing a franchise, a privilege denied those doing an intrastate business, upon paying the amount required by the ordinance, and dispenses with such payment upon a franchise being obtained. It will be presumed that the owners of an interstate line, if they elect, may obtain a franchise on as favorable terms as the owners of intrastate and local lines.

ID.—REASONABLENESS OF CHARGE FOR USE OF STREETS.—The city of Pasadena having the power to withhold from telephone companies the right to exclusively occupy portions of its streets for poles and wires, or to permit such occupation on such terms as are satisfactory to it, the courts will not determine the reasonableness of an annual charge imposed by the city for the right to use its streets for such poles and wires.

APPEALS from an order of the Superior Court of Los Angeles County dissolving a temporary injunction, from a judgment denying an injunction and from an order denying a new trial. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

E. S. Pillsbury, Alfred Sutro, and Pillsbury, Madison & Sutro, for Appellants.

J. P. Wood, City Attorney of Pasadena, Wm. J. Carr, Assistant City Attorney, for Respondents.

John W. Shenk, City Attorney of Los Angeles, Percy V. Long, City Attorney of San Francisco, and Jesse H. Steinhart, Assistant City Attorney, *Amici Curiæ.*

ANGELLOTTI, J.—These are appeals from an order dissolving a temporary injunction, and from a judgment denying an injunction and an order denying a motion for a new trial in an action brought by plaintiffs against the city of Pasadena and certain officers of said city to obtain a decree restraining the defendants from in any manner interfering with the maintenance or operation of plaintiffs' telephone and telegraph system so far as the same is located on public streets in said city.

There is no conflict in the evidence as to what we consider the material facts in this case. Some of our statements in regard thereto are taken from the opinion of the trial court. The city of Pasadena was organized in the year 1886 under the general laws of the state as a city of the sixth class, and in the year 1901 reorganized under a freeholders' charter, pursuant to the provisions of the constitution. Prior to its organization as a city in 1886, viz.: in the year 1883, the Sunset Telephone-Telegraph Company established a telephone system therein, using the roads and streets thereof for its poles and wires. Plaintiff Sunset Telephone & Telegraph Company was incorporated in April, 1889, and immediately acquired by assignment all of the property of the Sunset Telephone-Telegraph Company, including its lines in Pasadena, and whatever rights it had acquired in that city. The other plaintiff, the Pacific etc. Company, was incorporated in 1906, and is the lessee of its co-plaintiff of its entire telephone and telegraph system. The interests of the two plaintiffs in the matters involved are so close that they may be here treated as one person, and for convenience will be so treated and referred to in the singular number. As originally installed there was a local exchange and long distance connections. "The system has been extended, and has now about 4000 regular subscribers. Throughout the state of California, and in its various cities and towns, the said plaintiff has installed a similar system for both local and long distance use, serving its subscribers with about 195,000 telephones. It has likewise installed in the states of Oregon, Washington, Montana, Idaho, and Nevada, a system

for local and long distance service, having in those states an aggregate of about 135,000 telephones for its subscribers. The entire system in California and the other states is connected, forming a homogeneous whole." It may be assumed for the purposes of this case that plaintiff's lines in Pasadena have always been used in the conduct of an interstate telephone business. Although plaintiff's charter describes it as a telephone *and* telegraph company, it is clear that it has always been primarily and principally engaged in purely a "telephone" as distinguished from a "telegraph" business, and that while it has occasionally telegraphed some messages over its main telephone wires, such transmission of messages, to use the language of the finding of the trial court, "is not usual or customary, and the number of them transmitted is insignificant, and too insignificant to characterize the lines of plaintiffs or any of the lines of either of plaintiffs, situated in the city of Pasadena, as telegraph lines." Of course, its lines connecting its offices or exchanges with the houses and places of business of its subscribers, constituting the great bulk of its system in the city of Pasadena, have never been used at all for the transmission of telegraphic messages. The trial court found that until the year 1901, neither of plaintiffs transmitted any telegraph messages at all, over or by the aid or use of lines situated in the city of Pasadena, and that their lines situated in said city were not used at all for telegraphic purposes, and that the only lines or wires of plaintiff over which any telegraph messages have been or are at any time transmitted are telephone wires, used usually for telephone purposes, placed upon poles running on Fair Oaks Avenue south of Colorado Street to the south limits of said city. The findings of the trial court in this connection are sufficiently sustained by the evidence. It is manifest from the record that what plaintiff is seeking is to restrain action on the part of the local authorities in regard to a "telephone" as distinguished from a "telegraph" system.

On August 6, 1887, an ordinance was adopted by the board of trustees of the city on application of the Sunset Telephone-Telegraph Company, being ordinance No. 75, entitled "An ordinance granting to the Sunset Telephone-Telegraph Company the right to erect poles and run telephone wires along the public streets." This ordinance purported to grant to

the applicant the privilege for the period of twenty years from
its date to erect and maintain telephone poles upon, and to
run wires over and along the public highways and thorough-
fares of the city of Pasadena, subject to certain conditions.
These conditions reserved to the board of trustees of the city
certain supervision and control in the matter of the location,
construction, and maintenance of the poles and wires for the
purpose of preventing undue interference with the use of
the streets by the public.    After the expiration of the term
prescribed by this ordinance—viz.: on February 4, 1908, there
was duly enacted an ordinance, known as ordinance No. 841,
providing that it shall be unlawful to erect or maintain on
any of the streets of the city any telegraph or telephone poles
or wires for use in "doing local or intrastate business without
a franchise or privilege therefor from the city of Pasadena,"
and that any person, etc., maintaining or operating upon the
streets any telegraph or telephone lines or poles "doing an
interstate business," shall pay to the city semi-annually in ad-
vance, "for the use of the streets, alleys, and public places
by the poles, wires and appliances of such lines," the sum of
seventy-five cents for each and every pole so maintained and
operated, unless such person, etc., shall "have or secure a
franchise or privilege" therefor.    Poles and wires maintained
in violation of the provisions of this ordinance are declared
thereby to be public nuisances, and it is made the duty of
certain officers of the city to summarily abate and remove
any poles, wires, or appliances so maintained.    Plaintiff hav-
ing failed to apply for or secure from the city any franchise
for the use of the streets for its poles and wires, and having
refused to pay any of the charges imposed by the ordinance
for the use of the streets for its poles and wires, the city au-
thorities were proceeding with the work of summarily remov-
ing such poles and wires from the streets, with the result that
this action was commenced to obtain an injunction restrain-
ing any such action by the city authorities, the claim of plain-
tiff being that as to it ordinance 841 is void and without force.

It is to be borne in mind that the only interference with
plaintiff threatened by the city authorities is that of prevent-
ing the exclusive occupation by it with poles and wires of
portions of the public streets of the city except upon com-
pliance with the terms of the ordinance.    To warrant such

exclusive use of any portion of a public highway by any person or corporation, there must be, as was said by the trial judge, a "grant of right from a competent authority."

It was claimed by plaintiff in the lower court that such a grant was to be found in the provisions of the act of Congress of July 24, 1866, entitled, "An act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal and military purposes," the plaintiff being a telegraph as well as a telephone company and having accepted the provisions of said act in the year 1897. For all the purposes of this appeal, this claim has been expressly abandoned by plaintiff. It may properly be noted, in passing, that such a claim is without force under the views expressed in the recent case of *Western Union Telegraph Co.* v. *Hopkins,* 160 Cal. 106, [116 Pac. 557].

Plaintiff relies upon the claim that all its lines in Pasadena are interstate telephone and telegraph lines doing an interstate telephone and telegraph business, as giving it the right to occupy the public streets thereof without permission of the city. We may assume purely for the purposes of this decision, that the claim of the plaintiff as to the interstate character of its business in Pasadena is sustained by the evidence, although the trial court found otherwise. It is, of course, not claimed and could not well be claimed, that the mere fact that one is engaged in interstate commerce gives him the right to permanently occupy, to the exclusion of the public, portions of public highways of a state, either within or without cities, in the absence of permission to do so from proper state authority. But it is urged that the right has been granted to plaintiff by the state by section 1 of the act of the legislature of the state of California, approved March 22, 1905, entitled, "An act providing for the sale of street-railroad and other franchises in counties and municipalities," etc. (Stats. 1905, p. 777.) That section, so far as material, simply provides that "every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate street or suburban railroads upon any public street or highway, . . . or to exercise any other privilege whatever hereafter proposed to be granted by boards of supervisors, boards of trustees, or common councils, or other governing or legislative bodies of any county, city and county, city or town within this state, *ex-*

*cept steam railroads and except telegraph or telephone lines, doing an interstate business, . . .* shall be granted upon the conditions in this act provided, and not otherwise." The remaining sections prescribe the method of procedure to be followed and the conditions upon which the franchises specified shall be granted, such conditions including among others one to the effect that the holder must, after the first five years of the life of the franchise, pay to the county or municipality two per cent of the gross annual receipts, arising from the use, operation, or possession of the franchise. It appears very clear to us that this act cannot reasonably be construed as *granting* any right in public highways. Its whole purpose was to prescribe the method and conditions upon which the franchises included within its terms *might be* granted by the legislative body authorized by law to make the grant, or, as said in *McGinnis* v. *Mayor etc.,* 153 Cal. 711, [96 Pac. 367], "to prevent the granting thereof in any other manner than that prescribed," and the only effect of the exception was to exempt the excepted franchises from the operation of the act. So that assuming that plaintiffs' claim as to the interstate character of its business in Pasadena is correct, that fact alone gives it no right to exclusive possession of portions of the public highways in the city. And it may be said in passing that we cannot see that the question whether this claim be well founded or not is at all material in the determination of this case, unless it be also true that ordinance No. 841 discriminates against those engaged in interstate telephone or telegraph business, a matter to which we shall hereafter refer.

Plaintiffs' claim of right to use the streets of Pasadena for its poles and wires without permission from the city is based principally upon section 536 of the Civil Code, providing ever since its re-enactment in 1905, [Stats. 1905, p. 492], that "telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." Prior to its re-enactment in 1905 this section did not in express terms include telephone

corporations or telephone lines, and it is very earnestly argued by defendants and was held by the learned trial judge that until such re-enactment the section was not applicable to telephone corporations or lines.

Section 536 of the Civil Code, was a part of the original Civil Code, adopted in 1872, and was never changed or amended in any respect until its repeal and re-enactment in the year 1905. As we have already stated, until the year 1905, it contained no reference in terms to telephone corporations, reading "Telegraph corporations may construct lines of telegraph along and upon," etc. In the recent case of *Western Union Telegraph Co.* v. *Hopkins,* 160 Cal. 106, [116 Pac. 557], we considered the effect of this section, so far as telegraph corporations are concerned. It was there concluded that the section is operative to effect a grant to all telegraph corporations so far as acceptance of its provisions by construction and maintenance of its lines in public highways is had, in the absence of later enactment having the effect of repealing the same or suspending its operation as to particular portions of the state, and that in so far as such acceptance is had prior to any such repeal or suspension, and to the extent of the actual occupation by any corporation of public streets constituting such acceptance, a vested right accrues to the corporation, subject only to the lawful exercise of the police power, of which it cannot be deprived at the instance of the state without compensation. This, as his opinion indicates, was the view of the learned judge of the trial court in this case.

This construction makes the section a pure grant by the state of a franchise in its highways, one as suggested by defendants "of incalculable value and importance." It is a well settled principle that grants contained in public statutes or made by public officers or public bodies are to be strictly construed in favor of the public, the rule being clearly stated in *Knoxville Water Co.* v. *Knoxville,* 200 U. S. 22, 33, [50 L. Ed. 353, 26 Sup. Ct. 224], as follows: "Only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government has an interest. Statutory grants of that character are to be construed strictly in favor of the public, and whatever is not unequivocally granted is withheld. Nothing passes by implication." This rule of construction of public grants has been

incorporated in our Civil Code, section 1069 of the Civil Code providing: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, *and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor."* The italics are, of course, ours. (See opinion of Chief Justice Beatty in *Oakland* v. *Oakland Water Front Co.,* 118 Cal. 174 and 175, [50 Pac. 277], and *Clark* v. *City of Los Angeles,* 160 Cal. 30, [116 Pac. 722]. It is urged by learned counsel that this rule has no application to the question in dispute here, going only to the question of the *extent* of a valid grant and in no way to the *identity* of the grantee, and the language "but this rule presupposes the existence of an effective grant, and relates only to the extent of its operation," used by this court in *Cullen* v. *Sprigg,* 83 Cal. 56, is quoted in support of this claim. This was said in disposing of a claim that section 1069 of the Civil Code was applicable in determining the question whether a grant to a private party was void for uncertainty, and was immediately followed by the statement: "In all cases, it must be presumed that a grantor intended to make a valid grant of some property unless the contrary appears." Assuming, in favor of plaintiff, that the rule goes only to the question of the extent of a valid grant, it appears to us that such a question is necessarily presented here. The thing granted, as described in the statute, was the right to "construct *lines of telegraph* along and upon any public road or highway," etc., and in such places to "erect poles," etc., "for supporting the insulators, wires, and other necessary fixtures of their lines," i. e. the lines of a *telegraph* system. Whether or not this description included the poles and wires of a telephone system is a question very materially affecting the extent of the grant made by the state and the consequent burden imposed on public streets and highways. We can see no good reason why the rule of strict construction in favor of the public is not applicable to this section, which is purely a grant by the state of valuable rights.

In view of this rule, we are satisfied that the decision in *Davis* v. *Pacific Tel. & Tel. Co.,* 127 Cal. 312, [57 Pac. 764, 59 Pac. 698], cannot be taken as definitely settling the meaning of the word "telegraph," as the same is used in section 536 of the Civil Code. The question there was whether the

words "any line of telegraph" as used in section 591 of the
Penal Code, as it existed prior to the year 1905, included a
telephone line.   The section made it a misdemeanor for any
one to maliciously take down, remove, injure, or obstruct "any
line of telegraph," or to sever any wire thereof.   After show-
ing that in numerous cases in other jurisdictions the courts
had held that "telephone" is included within the meaning of
"telegraph," the court said that "if the consideration could be
limited to a strict etymological point of view, it would have
to be conceded at once that there is a difference in the mean-
ing of the two words, the one conveying the idea of trans-
mission of writing to a distance, the other the transmission
of sound to a distance."   But it was declared that in their
"present sense and acceptation" the term "telegraph" means
"any apparatus for transmitting messages by means of elec-
tric currents and signals, and embraces within its meaning
the narrower word 'telephone.'"   It was held that in con-
templation of section 4 of the Penal Code, which provides
that the rule of the common law that penal statutes are to
be strictly construed has no application to the code, and that
"all its provisions are to be construed according to the fair
import of their terms with a view to effect its object and to
promote justice," and in recognition of the fact that a sub-
stantial identity exists between the two words, no hesitation
need be expressed in declaring that under section 591 of the
Penal Code a criminal prosecution will lie for the illegal de-
struction of a telephone wire.

When we consider the rules applicable in the construction
of public grants, it seems at once apparent, in view of the
fact that the telephone was absolutely unknown at the time of
the enactment of section 536 of the Civil Code, that the de-
cision in *Davis* v. *Pacific Tel. & Tel. Co.*, 127 Cal. 312, [57
Pac. 764, 59 Pac. 698], is not controlling here.   There is no
rule of law that necessarily requires the same meaning to be
given to the same word used in different places in the same
statute.   It is plain that section 4480 of the Political Code,
as was said by Judge Gilbert in his dissenting opinion in
*Sunset Tel. & Tel. Co.* v. *Pomona*, 172 Fed. 840, [97 C. C. A.
262], "does not purport to say that a word used in the statutes
shall have the same meaning wherever used."   And while for
certain purposes, the provisions of the four codes must be

construed as though they had all been passed at the same moment of time, and were parts of the same statute (Pol. Code, sec. 4480), it is manifest that, dealing as they do with all the subjects of our statutory law, the *prima facie* presumption that a word used more than once in the same statute is always used in the same sense, if it be conceded to apply at all, is necessarily of the slightest weight when considering sections in different codes relating to essentially different matters and subject to different rules of construction. The case of *Bruner* v. *Superior Court,* 92 Cal. 239, [28 Pac. 341], cannot be taken as holding otherwise. for, as was said by Judge Gilbert in the Pomona case, "the word *telegraph* has not been defined in either of the codes, as was the word elisor," the word there under consideration, which was clearly defined in section 4192 of the Political Code. The difference between the telegraph and telephone in respect to matters affecting the question at bar is very pronounced. The telephone being a device by which the human voice is directly transmitted, all that is essential to the sending of a message thereby is the speaking of the same into a comparatively simple appliance connected with the wire along which the current is to go. Trained and skilled operators are necessary only at the central offices for the purpose of answering calls and making the necessary connections of wires. Skilled experts, only, can operate the telegraph, manipulate its instruments, and understand its signals. (See *Telegraph Co.* v. *Nashville,* 118 Tenn. 19, [101 S. W. 770].) This difference is accountable for the greatest conceivable difference in the extent of the burden on public streets and highways by the use by a telegraph company and a telephone company respectively of such streets and highways for the poles and wires of the system, especially in villages, towns, and cities. A telegraph line does no purely local business, but simply runs through a town or city, having therein one or more offices where messages are received and transmitted by trained operators. The result is that its use of public streets for the purposes of its poles and wires is limited to its main through line, and such branches as are essential to connect with its various offices, which are necessarily very few in number. While the telephone is also used for long distance communication, its most common use is for communication among the people of a particular city or town. Any

person being able to use the same in his home, office, or place of business, through a simple and inexpensive instrument placed therein and connected by wire with a central agency, the subscribers therefor in a city or town constitute a large proportion of the inhabitants, numbering in a city like Pasadena several thousand. The result is well expressed by the supreme court of Tennessee in *Telegraph Co.* v. *Nashville,* 118 Tenn. 19, [101 S. W. 770],] as follows: "A telephone system, however, to be effective requires, not only rights of way to enter and leave the city, but also to occupy *all* its streets and alleys, and to enter its business houses, residences, and other places, thus making it necessary to use many poles and wires and other fixtures, in order to do the business expected of it. It must therefore, necessarily, make use of the *streets and alleys generally* of the city, and incumber them with a network of wires and poles and fixtures, to a much greater extent than a telegraph system would do." The italics are ours.

As we have said, the telephone was unknown at the time of the enactment of section 536 of the Civil Code in the year 1872. While the possibility of transmitting speech along wires had previously been suggested by scientists, no one had ever succeeded in devising a practical instrument therefor until Bell made his discovery in the year 1875. To show that the idea of such transmission of the human voice was up to that time but a dream of scientists, reference need only be made to the "Telephone Cases," 126 U. S. 1, [31 L. Ed. 863, 8 Sup. Ct. 778]. Under these circumstances, our legislature granted the right to construct *lines of telegraph,* with the necessary poles, etc., along and upon the public highways of the state. We have seen that this court has expressly recognized that from a strict etymological point of view, telephone lines would not be included in the words "lines of telegraph," or telephone corporations, within the words "telegraph corporations." We have seen further that the circumstances at that time were such that in its common acceptation the word "telegraph" must have meant only the kind of communication then known and in practical use under that name, entirely excluding all idea of any such thing as the direct transmission of the human voice, and that by the simple method of speaking into an instrument of such slight cost that it could be placed in every

dwelling-house and place of business, with the necessary result that the use of practically all of the streets would be required. It is to be remembered that the question in determining the meaning of the word "telegraph" contained in this statutory grant is, what was in the minds of the legislators as to its meaning when they used it. No rule of construction applicable to public grants warrants the inclusion therein of privileges not embraced within the common acceptation of the language used. Practically the same question as is here involved was presented to the supreme court of the United States in *Richmond* v. *Southern Bell Tel. & Tel. Co.*, 174 U. S. 761, [43 L. Ed. 1162, 19 Sup. Ct. 778]. It was there claimed that the act of Congress of July 24, 1866, granting to any "telegraph company" accepting the provisions of the act the right to construct, maintain, and operate "lines of telegraph" over and along military and post roads, etc., applied to telephone companies. After reviewing the decisions that had been rendered by other courts up to that time (1889), the court held that the act was not applicable to such companies. Among other things, the court said: "It may be that the public policy intended to be promoted by the act of Congress of 1866 would suggest the granting to telephone companies of the rights and privileges accorded to telegraph companies. And it may be that if the telephone had been known and in use when that act was passed, Congress would have embraced in its provisions companies employing instruments for electrically transmitting articulate speech. But the question is, not what Congress might have done in 1866, nor what it may or ought now to do, but what was in its mind when enacting the statute in question. Nothing was then distinctly known of any device by which articulate  speech could be electrically transmitted or received between different points, more or less distant from each other, nor of companies organized for transmitting messages in that mode. Bell's invention was not made public until 1876. Of the different modes now employed to electrically transmit messages between distant points, Congress in 1866 knew only of the invention then and now popularly called the telegraph. When therefore the act of 1866 speaks of telegraph companies, it could have meant only such companies as employed the means then used or embraced by existing inventions for the purpose of transmitting messages

merely by sounds of instruments and by signs or writings."
The court further said that the conclusion that the act con-
ferred upon telephone companies the valuable rights and
privileges therein specified is not authorized by any explicit
language used by Congress.  While it is true, as said by learned
counsel for plaintiff, that this court is the ultimate tribunal
in the matter of the construction of a statute of this state,
we are satisfied that the court in that case correctly construed
the act of Congress, and that what is said in the opinion is
equally applicable to our section 536 of the Civil Code.  A
similar question was presented to the supreme court of Ten-
nessee in *Telegraph Co.* v. *Nashville,* a state statute very much
like ours being there involved, and a similar conclusion reach-
ed.  Any other construction would, it appears to us, make this
statutory grant include rights and impose burdens on the
public that were never within the contemplation of the legis-
lature, and this case is a striking illustration of the wisdom
of the rule that requires a grant by the public to be strictly
construed in favor of the grantor.

We have examined the many cases cited by plaintiff, where-
in it is held that the word "telegraph" in a statute includes
"telephone."  Comparatively few of these cases involve any
question of the right of a telephone company to use public
streets and highways under a statutory grant to telegraph
companies, being generally, as our own Davis case, cases in
which the meaning of the word as used in some other statute
was involved.  For instance, the question whether a telephone
company could incorporate under a statute authorizing the
incorporation of telegraph companies, the question whether
such a company had the right of eminent domain under a
statute giving telegraph companies such right, the question
whether telephone companies were under the burdens and
obligations imposed on telegraph companies, the question
whether a statute providing for the assessment of telegraph
companies applied to telephone companies, were questions
presented in many of the cases.  But there are some cases
cited in which statutes giving telegraph companies rights and
privileges in public highways were held to include telephone
companies.  In none of these cases, however, does the ques-
tion of the effect of the rule requiring grants by the public
to be strictly construed in favor of the grantor appear to have

been discussed. In so far as these decisions may appear, upon a close examination of the condition of the statutory law upon which they are based, to be opposed to the conclusion we have reached, we are of the opinion that they should not be followed in this state.

We are thus brought to the conclusion that prior to its repeal and re-enactment in the year 1905, section 536 of the Civil Code was not applicable to telephone companies.

In the year 1901 the city of Pasadena became organized under a freeholders' charter, adopted under the provisions of section 8 of article XI of the constitution of the state, and has ever since continued as a city under such charter. (Stats. 1901, p. 884, et seq.). In the year 1896, section 6 of article XI of the constitution was so amended as to make the provisions of a freeholders' charter so adopted paramount to general laws enacted by the state legislature "in municipal affairs." The charter above referred to purports to confer upon the city of Pasadena full control of its streets, with power to determine whether and upon what terms portions thereof may be exclusively used and occupied by telegraph or telephone companies. By subdivision 13 of section 3 of article I, the city is declared to have the power to lay out, open, extend, widen, change, vacate, and improve streets; by subdivision 7 of section 10 of article VIII the city council is declared to have not only the power to require the placing underground of all telephone, telegraph and other wires, but also the power to "prohibit the placing of poles and the suspending of wires along or across any of the streets, alleys and public places of the city;" by subdivision 31 of the same section the city council is declared to have the power "to *grant* the right to *erect or lay telegraph or telephone wires,* to construct and operate street-railroads, to lay gas or water pipes, to erect poles and wires, or lay conduits for transmitting electric energy for lighting or power purposes *along or upon the public streets and highways of the city;* provided, however, that all such rights and franchises shall be granted subject to all the restrictions and limitations in this charter contained relating to the granting of franchises." The italics are ours. By section 3 of article XIII, as amended in February, 1905, [Stats. 1905, p. 1022], the terms for which any franchise may be granted was limited to twenty years, and

the city council was authorized to impose such lawful condi-
tions, restrictions, and limitations as may best subserve the
public interest and welfare. We are satisfied that these pro-
visions can reasonably be read in no other way than as evi-
dencing an intention to give to the city of Pasadena full
control of its streets and highways, with the power to de-
termine for itself whether any portion thereof shall be ex-
clusively used and occupied by the poles and wires of tele-
graph, telephone, or power companies. It cannot be disputed
in the light of the decisions that the state may surrender to
any municipality full control of its streets and highways in
regard to such matters, and, of course, an appropriate place
for an enactment of this character on the part of the state is,
under our constitutional provisions, the freeholders' charter
provided for by section 8, article XI. (See *Platt* v. *City and
County of San Francisco,* 158 Cal. 74, 82, et seq., [110 Pac.
304].) That the provisions of the charter purporting to
give such full control as to the use of streets for pipes and
conduits for the furnishing of water and light are not effec-
tive, in view of the direct grant for those purposes made by
section 19 of article XI of the constitution (see *In re Johnston,*
137 Cal. 115, [69 Pac. 973], is not a sufficient warrant for
holding that it was not intended to vest such control in the
city. We think it impossible to reasonably construe these pro-
visions as purporting to authorize on the part of the city only
such regulations as come within the domain of the police
power.

Are the matters referred to "municipal affairs" within the
meaning of those words as they are used in section 6 of article
XI of the constitution? There has been much discussion in
our decisions as to what matters are embraced in this term,
and it has been said that it is very difficult, if not impossible,
to give a general definition clearly defining the term "muni-
cipal affairs" and its scope. But we can see very little reason
in the argument that the question whether and to what extent
the streets of a municipality shall be subjected to such second-
ary uses as the maintenance therein of telegraph and telephone
poles and wires, the primary purpose for which highways are
established being the convenience of public travel, and such
secondary uses permanently excluding the public from using
for such purpose the portions occupied for such uses, is not a

municipal affair. If the provisions of not only the many free-holders' charters of this state but also those of the general Municipal Corporation Act and other statutes are to be given any effect in the consideration of this question, they demonstrate the existence of practically a universal idea that such matters are principally of local concern, and should be within the exclusive control of the municipality. Even in the case of the ordinary commercial railroad, we find legislative recognition of the fact that the question, whether such a railroad should be allowed to occupy, for its tracks any street, alley, or highway within a municipality is one of such concern to the municipality that its consent should be a prerequisite, it being provided in section 470 of the Civil Code, as enacted in 1872, that "no railroad corporation must use any street, alley, or highway . . . within any incorporated city or town, unless the right to so use the same is granted by a two-thirds vote of the town or city authority from which the right must emenate." As said by learned counsel for defendants, "the legislature has consistently recognized and treated the control of municipal streets by municipalities as a local or municipal affair as distinguished from a state affair." It is unquestioned that the matter of opening, widening, and vacating the streets of a municipality is purely a municipal affair. (See *Byrne* v. *Drain,* 127 Cal. 663, 667, [60 Pac. 433].) It would seem to be equally true that the question to what extent and upon what terms the primary use of these streets, which are constructed and maintained by the people of the city for use in common by the public for purposes of travel, shall be subjected to secondary uses completely excluding any use at all by the traveling public of the portions devoted to such secondary uses, is also a municipal affair, within the meaning of our constitutional provision. It is simply a question of the extent to which streets constructed and maintained by the city primarily for purposes of travel by the public shall be diverted to other uses excluding such primary use as to the portions so diverted, an absolute taking away from the city and its inhabitants of so much of the streets as is exclusively used for poles and wires.

In holding that a statute of the state of Washington made the consent of the city council of a municipality prerequisite to such use of the streets for telegraph and telephone lines, the

supreme court of that state said: "In addition to the reasons suggested heretofore for imposing the powers and duties upon municipalities to control the streets, it is pertinent to refer to the long usage in this country for vesting such authority in municipalities. Such usage is historical, and is expressed in many statutes in the different states and in the mother country. The people of a municipality, who incur and pay the expenses for the construction and maintenance of their streets, and who largely use them, are usually most capable of exercising discretion in the secondary and subordinate purposes for which their streets shall be used." (*State ex rel. Telephone & Telegraph Co.* v. *City of Spokane,* 24 Wash. 53, [63 Pac. 1116].) In the face of the long usage in such matters, by virtue of which this power has so frequently been regarded as one appropriate for a municipality to possess, it would be difficult to find warrant for the conclusion that although such power is in terms conferred by a charter, it is nevertheless not a municipal affair within the meaning of our constitution. That any citizen in the state may be interested in the maintenance and operation of a telephone system in the city of Pasadena, to the extent that he may desire "the quick and ready communication afforded by the telephone" with some resident thereof, is doubtless true, but we do not see that this affects the question whether the extent to which portions of the streets of Pasadena may be exclusively occupied by telegraph and telephone companies is a municipal affair. It may, however, be suggested that no persons can be more interested in having the quickest and most efficient method of communication available between Pasadena and the rest of the state than the people of Pasadena themselves, and it is not likely that any municipality will insist upon such arbitrary and unreasonable conditions in the matter of the use of its streets, as will result in cutting it off from such method of communication.

The matters referred to being "municipal affairs" within the meaning of our constitutional provision, the charter provisions vesting control in the city of Pasadena are not subject to general laws, and the re-enactment of section 536 of the Civil Code in 1905, by which certain rights in public highways were granted to telephone companies, conferred no right upon plaintiff so far as the streets of Pasadena are concerned.

It follows that plaintiff has no effectual "grant of right from a competent authority" for the use of the streets of the city of Pasadena for its poles and wires.

The ordinance is not open to the objection that it discriminates against lines doing an interstate business, in that it imposes a semi-annual charge of seventy-five cents for each pole of a line used in interstate business, and imposes no such charge for the poles of lines used in local or intrastate business. The discrimination, if any, is one entirely in favor of the interstate line. As to lines doing a local or intrastate business the requirement of the ordinance is absolute that such use of the streets cannot be had without a franchise therefor from the city of Pasadena. As to lines doing an interstate business, it is recognized that a franchise may also be obtained from the city, and it is expressly provided that if such person or corporation have or secure such franchise, it shall not be required to pay the amounts required by the ordinance during the life of the franchise. The requirement as to such lines is simply that either a franchise must be obtained for the use of the streets, as required for intrastate and local lines, or the charge imposed by the ordinance must be paid. In other words, no franchise need be procured for such use for interstate lines, but the streets, may be used for such lines without any grant by the city, provided the required charge be paid. At the same time, the owners of an interstate line, if they elect, may obtain such a franchise therefor just as and presumably on as favorable terms as the owners of intrastate and local lines may obtain their franchise, and thus exempt themselves from the payment of any such charge as is imposed by the ordinance. It is obvious, therefore, that there is no discrimination against interstate lines.

There is no question in this case of any actual discrimination against interstate companies in the enforcement of the ordinance, and the ordinance, so far as any attempt at discrimination is concerned, is fair on its face. It is of course needless to say that such a discrimination would not be allowable.

We are satisfied, in view of what has been said as to the power of the municipality in such matters, that no question is here involved as to the reasonableness of the amount of the semi-annual charge made by the ordinance. The city of Pasadena having the power to withhold from telephone companies

the right to exclusively occupy portions of its streets for poles and wires, or to permit such occupation on such terms as are satisfactory to it, we have, as suggested by the trial judge, no question whether or not the amount charged is a reasonable charge. As said by him, "If it be competent for the city to exclude the poles and wires of a telephone company from its streets (and for reasons here given it must be so held), then, clearly, it is competent for the city to name such terms and require the payment of such compensation as seems proper."

Our conclusions upon the matters we have discussed require an affirmance of the action of the trial court.

The judgment and orders appealed from are affirmed.

Shaw, J., Sloss, J., Henshaw, J., Lorigan, J., and Melvin, J., concurred.

Rehearing denied.