Wanamaker, J.,
concurring.
I concur in the judgment. I do not concur in the grounds of the judgment.
On January 11, 1918, The Cleveland Telephone Company filed an original action in this court asking for a writ of prohibition against the common pleas court of Cuyahoga county, to prohibit it from hearing and determining a case theretofore filed in that court, in which it was sought to enjoin The Cleveland Telephone Company from operating in the city of Cleveland under a rate different and higher than the rate theretofore fixed or attempted to be fixed by an ordinance "of the Cleveland city council.
The pleadings in the case in this court were drawn by both sides with the direct view and purpose of placing before this court the one big, vital question, to-wit:
*172 Does the statute creating the state public utilities commission prevail over the charter of the city of Cleveland in the fixing of telephone rates for the people of Cleveland ?
The pleadings were not only prepared by able and eminent counsel upon both sides for this single paramount purpose, but the written briefs were likewise so prepared.
The great importance of the case to public utility corporations, as well as to the millions of people residing in the municipalities of Ohio, brought an early hearing, supposedly upon the merits of the case.
On January 23d of this year the case was orally argued before this court and submitted, all with a view of obtaining a decision of this court upon this controlling question.
The only question that this court here and now decides is the following:
Is a writ of prohibition the proper remedy against the court of common pleas ?
Remedy of course has a keen professional interest, but relief has a much greater public interest. Both parties to this cause, and those for whom they speak, are intensely and justifiably concerned about this main question, and it should be now and here decided.
The effect of this 'judgment, by its refusal to determine and decide this question, remands the whole matter back to the court of common pleas of Cuyahoga county sirrtply to pass upon the question, in the first instance, as to whether or not that court has jurisdiction.
*173 After final determination by that court the defeated party may go to the court of appeals and there the case be prepared, heard and determined with considerable labor and no little expense.
After the adjudication of this question in the court of appeals the defeated party may come, as a matter of right, it being a constitutional question, to this court, and then this court will have again before it the identical question that the parties sought to raise, believed they had raised, and which they confidently submitted to this court. So that the decision of this main question in this case at this time would avoid three separate hearings, or trials, in three separate courts, to say nothing of the delays, the labor and expense.
This I conceive to be a violation of both letter and spirit of the obligations placed upon this court by the new Constitution of 1912, as to its original jurisdiction.
The people of Ohio had, for years, grown weary of the numerous trials in the numerous courts — the footballing of a case back and forth from one court to another until the parties were almost exhausted in patience and purse, with decisions ofttimes based upon minor, immaterial questions, purely technical, or upon matters of practice that did not go to the vital merits of the case.
In order to provide some direct and summary remedy for many of these evils, which resulted not only in delays of justice, but ofttimes in the denial of justice, the people of Ohio made some radical changes in the judicial article of their constitution; among others, increasing the original jurisdiction *174 of the supreme court by the addition of two writs, prohibition and procedendo.
In plain phrase, by prohibition they intended to prohibit, to stop litigation in courts and quasi-judicial bodies which had no jurisdiction over the' matter to be determined, or in which the relief sought was in excess of their jurisdiction.
By the second writ, procedendo, it was proposed to give the supreme court of Ohio the right and power to order said bodies to proceed to judgment without further delay.
In short, it was self-evident that the great cardinal purpose of the Constitutional Convention in this behalf was to get quick action, final action, economically and equitably administered, through one fair trial and one review.
In order to further protect this original jurisdiction, that judicial article, in the latter part of Section 2, Article IV, provided:
“No law shall be passed or rule made whereby any person shall be prevented from invoking the original jurisdiction of the supreme court,”
In the case of State, ex rel. Nolan, v. ClenDening, 93 Ohio St., 264, it was expressly held in the fourth paragraph of the syllabus:
“If such inferior courts or tribunals, in attempting to exercise judicial or quasi-judicial power, are proceeding in a matter wholly or partly outside of their jurisdiction, such inferior courts or tribunals are amenable to the writ of prohibition as to such ultra vires jurisdiction.”
All the judges concurred in this opinion. Sub *175 sequent cases upon the same question are to the same effect.
This court now holds, in effect, that this writ of prohibition cannot be allowed against a common pleas court upon the ground that that court has an inherent right to pass upon its own jurisdiction, and that that question has to be tested out according to the old-time method of prosecuting error through the various courts.
While the decision in the instant case does not, in express terms, lay down an express rule, it has the effect of such by hereafter exempting courts of common pleas from the operation of the writ of prohibition, contrary to the express terms of the constitutional amendment itself.
The Constitutional Debates, especially at page 1044 by Judge Worthington and Judge Peck, expressly show that it was the intention of the convention to make the writ apply to courts of common pleas; indeed to all courts inferior to the supreme court.
This court now simply decides this naked question, and nothing more, that the common pleas court has the right to pass upon the question of whether it has jurisdiction in the case begun in the city of Cleveland in the court of common pleas.
In short, it simply holds that the court of common pleas may guess at what this court will finally hold; that then the court of appeals may guess at what this court will finally hold; and that then, later, this court shall ultimately determine the identical question that is submitted in this case, and is now before this court, as I understand it.
*176 This question is all the more important because since the hearing of this case the state public utilities commission has had a hearing upon the matter of rates and has fixed the rates for the telephone company in the city of Cleveland at a rate higher than the ordinance rate passed by the city council under the city charter.
Clearly if the commission rate is a valid and constitutional one, there is nothing for the court of common pleas to hear. If the rate fixed by the city council of Cleveland, under the city charter and the “Home Rule” amendment to the constitution, is a valid constitutional rate, then there was nothing for the public utilities commissipn to hear.
I concur in this judgment, however, because I hold that the city of Cleveland, through its council, duly authorized by its charter framed pursuant to the “Home Rule” amendment to the Constitution of 1912, has clear and complete power to fix the rates, tolls and charges between such company and the inhabitants of the city of Cleveland, limiting the same to service within the city of Cleveland.
This being one of the biggest public questions that has ever come before the supreme court of Ohio under the constitutional amendments of 1912, I shall give, at some length, the reasons for my judgment.
For nearly a half century the cities and villages of Ohio had been in political bondage to the general assembly. Annually, or at least biennially, the political bosses and profiteers, state and local, had, ■ through the general assembly, made political footballs of the municipalities of Ohio by sundry and *177 divers kinds of “ripper” legislation. The general assembly had assumed a political guardianship over the cities and villages of Ohio, which the inhabitants of those municipalities resented, and in 1912 the people of the municipalities presented a petition of right to the Constitutional Convention to abolish the old political will of 1851, and by a new political will, or codicil, to forever free the cities from guardianship by the general assembly of Ohio in municipal affairs.
The Constitutional Convention granted the prayer of that petition by a vote of 99 for to 14 against, and at. the following September election the “Home Rule” amendment, which was known as Article XVIII, was overwhelmingly adopted by the people of Ohio, the ten counties containing the ten largest cities of Ohio alone furnishing more than 100,000 majority, showing the decisive demand for home rule for cities, as against general-assembly rule for cities.
The people of Ohio’s municipalities believed that the long fight for municipal home rule had been won. They believed that at last they had gotten the political bread for which they had long been pleading. The question now is, Did they get only a brick, and that, too, of the gold variety?
The question now before us is, What political power was delegated by this Article XVIII in the new political codicil of 1912?
Of course the “Home Rule” amendment must speak for itself, where the language is clear. And yet a small part of the debates.of the Constitutional
*178 Convention is illuminating upon this grant of power.
The venerable Judge Peck addressed a question to Professor Knight, who was virtually in charge of the “Home Rule” amendment, and the report of the proceedings and debates of the convention sets forth the following discourse at page 1451:
“Mr. Peck: I want to get back to this question as to general government and local self-government. In section 7 you say that ‘any city or village may frame, adopt or amend a charter for its government, and may exercise thereunder all powers of local self-government.’ . What powers do you mean?
“Mr. Knight: All the powers of local self-government, subject to the limitations of section 12.
“Mr. Peck: You don’t say anything about that?
“Mr. Knight: There is a specific limitation in section 12.
“Mr. Peck : Point it out.
“Mr Knight: Section 12: ‘The general assembly shall have authority to limit the power of municipalities to levy taxes and incur debts for local purposes.’” (Section 12 then;' Section 13 now.)
The backbone of municipal home rule in Ohio, if it has any backbone left, is contained in these words from Section 3 of Article XVIII:
“Sec. 3. Municipalities shall have authority to exercise all powers of local self-government.”
“All” power of “local self-government” surely does not mean “some” power or “part” power. It *179 means full and complete power of local self-government.
Neither does it mean any particular kind of power, police, eminent domain, taxation, or what not. The word “all” is comprehensive enough to include not merely the full quantity of power, but every kind of power necessary to modern, progressive and efficient local self-government in our Ohio municipalities.
The growth of police power has been made necessary by the growth of cities. Rural communities, generally speaking, are quite as simple and natural in their life as they were a half century ago, largely self-governing; each man is his own policeman, save occasional need for a town constable or the county sheriff; each man his own fireman; each man his own health officer, save with the occasional aid of the board of trustees. City conditions and city problems have accounted very largely for the necessity of the marvelous and complicated development of the police power. It is indispensable to self-government in all our municipalities.
When the constitution-makers were addressing themselves to this question, is it likely that they intended to except from “all powers of local self-government” the police power, which approximately involves ninety per cent, of the governmental power of cities ? In fact, it is the very soul and spirit of municipal government. The rest is mere shell and form of government.
Cities have produced these new social, industrial, commercial, safety and health conditions, and the problems of government resulting from them. Is *180 it not altogether likely that with these facts before them, which they knew and everybody else familiar with city life knows, the members of the Constitutional Convention granted or at least intended to grant to cities suitable and sufficient governmental police power to fairly and fully deal with these conditions and problems ?
If government derives its just power from “the consent of the governed,” is it to be presumed that the people of Ohio ever intended to take the solution and conduct of these municipal problems out of the hands of the people of the cities and confer them upon some state commission at Columbus, whose actions and orders are reviewable only by the supreme court of Ohio ? It is preposterous.
The Ohio “Home Rule” amendment is different from the home-rule amendment of any other state. However, it is more like the home-rule provision of the California Constitution than that of any other state.
What has the supreme court of California held as to the regulation of telephone companies under the home-rule charter in California, as reported in Sunset Telephone & Telegraph Co. v. City of Pasadena, 161 Cal., 265 ? The syllabus of that case tells its own story:
“The question whether and to what extent the streets of a municipality shall be subjected to such secondary uses as the maintenance therein of telegraph and telephone poles and wires is a 'municipal affair/ as those words are used in section 6 of article XI of the constitution, as amended in 1896, making the provisions of a freeholders’ charter *181 adopted by a municipality paramount to general laws enacted by the state legislature ‘in municipal affairs.’
“The freeholders’ charter of the city of Pasadena, which became effective in 1901, * * *
confers upon the city full control of its streets, with power to determine whether and upon what terms portions thereof may be exclusively used and occupied by telegraph or telephone companies. These matters being ‘municipal affairs,’ ” etc.
Six of the seven judges concurred and no judge dissented.
But it is here claimed that the charters in California are essentially different from the charters in Ohio, because before they can become effective in California they must first be approved by the legislature.
Now, since when did the authority and approval of a state legislature become a matter more supreme and obligatory than the grant of authority conferred directly by the people through a constitution, as is the case in the state of Ohio?
The reason this case is particularly helpful in construing our Ohio “Home Rule” amendment is that in California “municipal affairs” were not subject to the general laws of California, just as in Ohio all powers of local self-government are not subject to general laws, except that Section 13 limits the power of taxation, etc.
A very recent case decided by this court, Billings v. Cleveland Ry. Co., 92 Ohio St., 478, is to the same general and legal effect, and to my mind is controlling and decisive of this case.
*182 The city of Cleveland, by virtue of its charter, granted the right to a street railway company to construct its tracks upon Euclid avenue without the consents of a majority of the property owners, as provided in Sections 3777 and 9105, General Code.
An abutting property owner upon this street sought to enjoin the railway company from the construction of such track by reason of the fact that it had not complied with these statutes, notwithstanding the charter provision that consents were not necessary.
In this Billings case this court held that these statutes were of no effect in a city that had adopted a charter, where the charter provided expressly that no such consents were necessary.
The first paragraph of the syllabus is as follows:
“The granting of permission and the making of a contract to construct and operate a street railway in the streets of a city or village is a matter that may be provided for in a charter adopted by the municipality under Article XVIII of the Constitution.”
Manifestly, if the charter may provide for it, then such charter may conflict with a statute touching the same matter. Both cannot control. But the Billings case holds that the charter is supreme. Why? Because the power of the city is being exercised in reference to “municipal affairs” or to matters of “local self-government.”
The judges concurring in this judgment were Nichols, Johnson, Donahue, Wanamaker and Matthias.
*183 Now, the same doctrine that applies to street railroads in the use of the streets and public highways of a municipality must of necessity apply to a telephone company in the use of streets and public highways of a city. They are both transportation agencies. They both must obtain a franchise from the city. They both are public utilities. They both are essential to an indispensable public service, and in all essential respects are analogous in their relations to the city. The lines of both extend beyond the city. A part of the business of both is extra-territorial, including Cuyahoga county, including the main thoroughfares of the state; indeed it may be interstate.
I hold, therefore, that under the general grant of power in Section 3, the municipality is supreme and paramount as to all “municipal affairs,” as to “all powers of local self-government,” and that the subject-matter of street railroads, telephones and other public utilities is clearly and conclusively comprehended within both of these phrases.
The telephone company would change Section 3, which reads, in full, “Section 3. [Part One] Municipalities shall have authority to exercise all powers of local self-government and [Part Two] to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws,” so as to make it read “Municipalities shall have authority to exercise all powers of local self-government ‘not in conflict with general laws.’ ”
I am frank to admit that if this last phrasing is the equivalent in legal and constitutional effect to *184 the phrasing and form of the Constitution, then municipalities are to-day, as they were before 1912, still subject to any and all general laws.
Did the constitution-makers and adopters so intend?
They are presumed to have given to their language its natural and customary meaning, to have meant what they said, and to have said what they meant. If they meant that municipalities should exercise only powers “not in conflict with general laws,” would they not naturally and probably so have said ?
This is the language used in the Constitution of the state of Washington:
“Any city * * * shall be permitted to frame a charter for its own government consistent with and subject to the constitution and laws of this state.” (Section 10, Article XI.)
The Missouri Constitution as to chartered cities reads:
“Any city * • * * may frame a charter for its own government, consistent with and subject to the Constitution and laws of this state,” etc. (Section 16, Article IX.)
Oregon’s Constitution provides for a city charter, but does not say what powers shall be exercised under it, leaving it of course for the legislature’s determination by general laws.
With these various constitutions before them, as is clearly indicated by the debates, it is strikingly significant that the members of the Ohio Constitutional Convention of 1912 did not follow any of them.
*185 Here it is fitting to observe that the various decisions cited in support of the Telephone Company’s claim from Washington, Oregon and Missouri are wholly inapplicable. These states are now just where Ohio was up to 1912. It would be just as appropriate and enlightening to quote some of the old decisions in Ohio before the “Home Rule” amendment took effect as to quote the decisions from states where they have no like home-rule amendment. They are as helpful and valuable as a last year’s bird’s-nest.
If this reasoning is sound, then it is clear that Ohio’s constitution-makers of 1912 intended something entirely different from the Washington constitutional provision, the Oregon constitutional provision, or the Missouri constitutional provision. As before observed, ours is more like the provision of the California Constitution.
Now, what does “not in conflict with general laws” modify? It is quite plain that it was not intended to modify “all powers of local self-government;” else it would have so said. Part One, as above referred to for convenience, relates to a grant of municipal power and the full and' complete grant of that power. Part Two relates solely to the grant of state power, and when the municipality undertakes to exercise such state power naturally and sensibly it should be “not in conflict with general laws.”
This conclusion is further reenforced by the fact that Part One and Part Two are connected by the conjunction “and.” The construction contended for by the telephone company is that Part Two *186 subtracts from Part One, limits Part One to all “general laws.”
Now everybody who knows the rudiments of English grammar and rhetoric knows that “and” does not mean less, but more; that “and” is not a word of subtraction, but addition.
As to municipal powers there was nothing further to be granted. That had been fully done in Part One.
It is significant that in Part One we have the word “powers.” In Part Two this word “powers” does not appear, but instead we have the word “regulations,” and these “regulations,” it is provided, shall not be “in conflict with general laws.”
What is the meaning of the word “regulations,” as used here in the constitution ?
The words “police regulations” are not new words in Ohio. Judge Johnson refers to their use and scope in his opinion in the case of Fitzgerald v. City of Cleveland, 88 Ohio St., 338, at page 359, as follows:
“Concerning the provision in Section 3, Article XVIII (may adopt such local police, sanitary and other similar regulations as are not in conflict with general laws), the general laws referred to are obviously such as relate to police, sanitary and other similar regulations, and which apply uniformly throughout the state. They involve the concern of the state for the peace, health and safety of all its people, wholly separate and distinct from, and without reference to, any of its political subdivisions — such as regulate the morals of the people, the purity of their food, the protection of *187 the streams, the safety of buildings and similar matters.
“Manifestly, therefore, it was necessary, when the constitutional convention was conferring all powers of local self-government on cities, to provide that, in the adoption of such regulations by any city for itself (police, sanitary and similar ones), they should not conflict with general laws on the subject.
“It is a well-settled rule that the body adopting amendments, such as are here involved, will be presumed to have had in mind the course of legislation and existing statutes touching the subjects dealt with. People, ex rel. Jackson, v. Potter, 47 N. Y., 380, and cases cited. The legislature of Ohio in the codifications adopted by it, covering many years, including the last one adopted, has included a separate title, designated by it ‘Police Regulations/ in which it has included the general laws of the character we have above described. If it had been intended that the limitation should comprise the wide and elastic scope contended for, it would have been so expressed.”
These regulations are generally of a penal nature and are found in Page and Adams’ Annotated Ohio General Code, Vol. 3, p. 209. They pertain to adulterations, animals, auctions, butter and cheese factories, commission merchants, cigarettes, explosives, fences, ferries, gaming, intoxicating liquors, mobs, pawnbrokers, shows, trading stamps, weights and measures, etc., some thirty-four different heads. Of course this does not embrace all of them, but it serves to illustrate what the con *188 stitutional convention meant by the use of the word “regulation.” If they had meant police powers generally, would they not likely have so written it? They used the word “powers” in the first part of Section 3. They did not use the word “powers” in the second part of Section 3, but, instead, the word “regulations.”
But there is positive constitutional proof that Part Two of said Section 3 was not intended as a limitation upon Part One, but rather as an addition in the nature of state power, not municipal power.
That constitutional proof to the effect that the general assembly’s acts should not operate in cities after the “Home Rule” amendment went into effect appears in Section 2 of Article XVIII, dealing with the subject “Municipal Corporations.” For convenience sake I have divided said Section 2 into two parts:
Part One: “General laws shall be passed to provide for the incorporation and government of cities and villages.”
This is the first grant of power to the general assembly touching municipal corporations and was evidently intended to provide a skeleton form of government under which cities would operate until they chose a form of their own through a charter.
This is followed in the same section by Part Two:
Part Two: “and additional laws may also be passed for the government of municipalities adopting the same.”
Then follows this language as to such additional laws:
*189 “But no such additional law shall become operative in any municipality until it shall have been submitted to the electors thereof, and affirmed by a majority of those voting thereon, under regulations to be established by law.”
Here we have an immunity, an exemption of municipalities from the operation and effect of the statutes of Ohio under the head of “additional” laws, showing clearly and conclusively that such laws could not be forced upon the city and that before they could become operative in the city they must first be • submitted to and approved by the electors.
In short, the whole “Municipal Home Rule” amendment, Article XVIII, shows clearly that the will of the people of the cities by grant of power from the people of Ohio was to be forever paramount to the general assembly of Ohio, to any board or commission which it might create, or even to the supreme court of Ohio, which is made the reviewing body upon any action or orders of the state public utilities commission.
This part of the section pertaining to “additional” laws has not even been referred to by the eminent counsel for the Telephone Company. No one has suggested any meaning or force for this constitutional provision which would not include under the head of “additional” laws the various statutes creating the public utilities commission.
I hold, therefore, that, by virtue of the last part of Section 2 of Article XVIII, before the public utilities statute can become operative in the city of Cleveland, there must be a referendum upon it *190 as an “additional law” by the people of the city of Cleveland, pursuant to Section 2 of Article XVIII of the Constitution.
The basic fallacy of the Telephone Company’s claim is, “That all police power is a state function,” whether it relates to affairs that are essentially municipal or affairs that are essentially state, and that the exercise of such power is expressly committed and delegated to the general assembly of Ohio and a municipality’s charter and ordinance must be subservient thereto.
Of course the exercise of the police power is a sovereign power, but not necessarily a “state” power.
But who is the sovereign? Who is the state? Once upon a time Louis XIV said “I am the state.” The Telephone Company seems to hold that in the municipalities of Ohio the general assembly is the state. But I- remember that it is written in the Constitution of Ohio that “all political power is inherent in the people;” that the people are the sovereign, the people are the state, and that no political department of the state or any political subdivision thereof can exercise any power not expressly delegated or delegated by necessary implication.
Now, when the people in 1912 through their Constitutional Convention and the referendum ^hereon made a new distribution, a new delegation of power, they were the sovereign who granted the police power; and when by the sovereign grant, the constitution, they expressly declare that municipalities shall exercise “all powers of local self- *191 government,” and the municipalities at once enter upon the exercise of that power, the other governmental departments of the state of Ohio are, by necessary implication, deprived of the right to exercise such power.
I claim that this is the reasonable, natural and intended meaning of this constitutional grant of power from the people of Ohio to the people of the municipalities, and that the liberal rule of construction should apply in such cases.
It is contended, however, that the strict rule of construction applies in this case to the constitutional grant of power, and we are referred, as an authority upon that proposition, to Woodburn v. Public Service Commission, 82 Ore., 114. A quotation from the syllabus in that case is as follows:
“Since the right to regulate rates is an inherent element of sovereignty, such right can be delegated to a municipality only by clear and express terms, and all doubts must be resolved against the municipality.”
I admit that this is the rule in Oregon, where hypercritical technicalities and subservience to antiquated precedents seem to be the prevailing doctrine, as proof of which I refer to that same court’s opinion delivered in the same year in the case of White v. East Side Mill Co., 81 Ore., 107.
We are also referred to State, ex rel. Toledo, v. Cooper, Auditor, 97 Ohio St., 86. I did not concur in that opinion or judgment. If that case held to the doctrine of strict construction in interpreting constitutional grants of power, as it seems to hold, then it reverses and violates the uniform and well- *192 settled doctrine pertaining to constitutional construction.
Judge Cooley in his immortal work, Cooley’s Constitutional Limitations (7 ed.), page 93, says: “Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.”
Indeed the able and eminent counsel for the Telephone Company in their very elaborate brief admit the liberal doctrine to be sound and true in their use of the following language:
“The constitution should be liberally construed in respect of all governmental matters of purely local municipal concern, so that municipalities may be unhampered in the exercise of powers legitimately covered by very general constitutional provisions.”
Cases galore could be cited- in support of this proposition, but it is unnecessary. Common sense and average reason are all that are needed to see that when the people of Ohio make a general grant of power in á constitution they need not specify every one of a hundred or a thousand things that are ordinarily or necessarily embraced within that general grant of power, and, if all police power necessary for local self-government passed to the city of Cleveland by the constitution and charter, then the city of Cleveland had the right to put the word “regulate” in its charter, and to make it *193 effective in fixing the fares and rates of all public utilities.
If the city of Cleveland may not regulate the rates of telephone companies, it may not regulate the rates of street car companies; it may not regulate the rates of water companies, light and heat companies, taxicab companies, or any other public utility; and, instead of the city charter being supreme in municipal matters, the municipal affairs of the city of Cleveland will be conducted by a commission at Columbus, now composed of three members, all able and honorable gentlemen, which commission may be reduced to one man with like authority, and all our boasts about making the country safe for democracy be only a fatuous farce.
We are talking about democracy for Germany and democracy for Russia, democracy for the world, but under the Telephone Company’s claim deny it here at home for the cities and villages of Ohio and hold that they can be governed by commissions not selected by them nor responsible to them. Let us be consistent some of the time.
It is urged that the function sought to be exercised here is not wholly and exclusively municipal. Of course The Cleveland Telephone Company does some business outside of the city, but that is not sought to be regulated in this case. The business sought to be regulated, however, is essentially, inherently, primarily and directly municipal. Analogy for this contention is found in questions relating to interstate and intrastate commerce decided uniformly by the federal and state courts. The rule there is well settled that state legislation that *194 directly and substantially affects intrastate commerce, but incidentally and remotely affects and regulates interstate commerce, is not unconstitutional. If, upon the other hand, it directly and substantially interferes with interstate commerce, such legislation is to that extent unconstitutional. So, here, if it can be said that the ordinance of the city of Cleveland fixing telephone rates in any wise affects an intercity relation or business outside of the municipality of Cleveland it is at most only incidental and remote, and does not in any wise invalidate or affect the right and power of the city of Cleveland to fix the rates within the city of Cleveland.
I agree with the proposition urged upon us that Section 2 of Article XIII, headed “Corporations,” authorizes the general assembly of Ohio, by statute, to create a public utilities commission with the general powers provided for in said section of the constitution, and in the main the general powers provided for in the statutes. But it-will be observed that this is a general section applying to all “corporations,” private and public, for profit and not for profit, public utilities and otherwise.
Manifestly constitutional provisions referring specifically to municipal corporations would control as against any other section of the constitution applying to corporations generally. Where there is conflict the rule is long and well settled that the specific provision must control.
That these public utilities are municipal affairs, are matters of local self-government, and were so contemplated by the framers of those amendments, *195 cannot be doubted from the reading of Sections 4, 5 and 6 of Article XVIII.
But it is claimed that the language “may contract” does not give power to fix compulsory rates. Granted. But why may not the same source of political power, the people, as well grant expressly and directly to municipalities the necessary police power to fix rates, as to grant it to the general assembly ?
The people are the one common source of power, and to all intents and purposes have made in Section 3 the grant of every kind and to the full measure of all powers of local self-government.
Consequences of judicial construction are ofttimes the best test of the reasonableness or unreasonableness of the construction. Tried by this test, the construction urged by the Telephone Company completely nullifies home rule in all the most important and essential affairs of municipal government, and the municipalities of Ohio are again at the absolute mercy of the general assembly, that may, whenever it pleases, by legislative act, assume and continue its guardianship over them:
My construction, upon the other hand, leaves the state public utilities commission to continue its general jurisdiction over corporations, but exempts municipalities with charters from the operation of the general laws of the state, as to all powers of local self-government, and no one can read the opinion of Judge Shauck in State, ex rel. Toledo, v. Lynch, 88 Ohio St., 71, and no one will claim that he was excessive in his zeal for the new constitutional amendments of 1912, without feeling that *196 the immunity concerning which he wrote, given to cities adopting charters under Article XVIII, has been grossly violated by this decision.
There is no immunity if the commission’s rate shall stand as the law of Ohio; but we are back where we were before the amendment of 1912, to all practical intents and purposes. Such a construction of the constitutional grant of power to municipalities is a practical illustration of a doctrine denounced by St. Paul, a great Roman lawyer of old, who said:
“The letter killeth, but the spirit giveth life.”
The spirit, the purpose, the intent, of the home-rule amendment must always be kept in mind in construing and applying it. Whether the testator be a private person bequeathing his personal estate or the public bequeathing its political power, the same rule applies as to intent. It is the polestar of construction.
I should like some one upon the other side -to draw a diagram giving the state commission the power to fix telephone rates, and then with definiteness and certainty show what is left to the municipality after this principle has been applied throughout governmental affairs. Nothing but the shell of home rule would remain. The soul and spirit would have passed away to some state general-assembly commission. Home rule would be an eloquent phrase, but empty in power and practice.