[Crim. No. 1733. In Bank.—September 13, 1912.]

In the Matter of the Application of ROBERT RUSSELL for a Writ of Habeas Corpus.

CONSTITUTIONAL LAW—CONSTRUCTION OF AMENDMENT.—The first step in the application and interpretation of an amendment to a constitution or statute is to consider the conditions existing prior to its adoption, so as to ascertain its objects and purposes.

ID.—MUNICIPAL CORPORATIONS — OPERATION OF PUBLIC UTILITIES— AMENDMENT OF SECTION 19 OF ARTICLE XI OF CONSTITUTION.—At the time of the adoption of the amendment of 1911 to section 19 of article XI of the state constitution, municipal corporations, unless expressly authorized by charter, were without power to make or operate the several public utilities mentioned in the amended section.

ID.—EFFECT OF AMENDMENT—MUNICIPAL CONTROL OF PUBLIC UTILITY CORPORATIONS—POWER TO PRESCRIBE CONDITIONS.—The effect of such amendment is to make to all municipal corporations a direct grant of power to make and operate public works of the kinds enumerated, and to place all works of like kind privately operated in control of the municipality. It expressly limits the pre-existing powers and rights available to private corporations and natural persons, who are permitted to engage in such enterprises within the city only "upon such conditions and under such regulations as the municipality may prescribe under its organic law."

ID.—CONDITIONS THAT MUNICIPALITY MAY PRESCRIBE.—The use, in that amendment, of the word "regulations" as something distinct from "conditions," implies a broader meaning in the latter word than mere regulation in the manner of use. It is used in its legal sense as meaning "a qualification, restriction or limitation modifying or destroying the original act with which it is connected," or defeating, terminating, or enlarging an estate granted. The conditions prescribed may, therefore, include every kind, conditions precedent as well as conditions subsequent, if they may be made under the city charter.

ID.—IMPOSITION OF CONDITIONS BY MUNICIPALITY—EFFECT OF CHARTER PROVISIONS.—Irrespective of any provisions in the charter of a city giving it power to prescribe the conditions upon which persons and corporations may establish and operate such works, the provision of the constitutional amendment itself, by necessary implication, gives each city power to prescribe such conditions. With respect to the mode of imposing and enforcing the conditions, the city is bound by the provisions of its charter, and cannot impose inconsistent conditions nor abrogate those of the charter. If the city

has prescribed conditions, they must be observed, or the construction and operation of such works will be unlawful.

ID.—POLICY OF MUNICIPALITY WITH RESPECT TO PUBLIC UTILITIES—MONOPOLISTIC OR COMPETITIVE METHOD MAY BE ADOPTED.—The intent of such amendment is to allow each municipality to determine for itself the policy of adopting either a monopolistic or competitive method of operating its public utilities. So far as concerns new systems of works, and not systems in prior operation, the amendment allows the municipality either to establish works of its own, excluding all others, or to permit but one system of works by refusing more than one franchise, or to encourage competition by allowing rival companies to enter the field, either in competition with its own system or with those of others.

ID.—ORDINANCES OF CITY OF LOS ANGELES—CONDITIONS IMPOSED UPON USE AND EXCAVATION OF STREETS.—Under the amendment of 1911 to section 19 of article XI of the state constitution, the city of Los Angeles had authority to enact ordinances, (1), making it unlawful for any person, firm, or corporation to make any excavation in a street for any purpose without first obtaining permission in writing from the board of public works, and requiring the applicant, before the permit issued, to state the purpose for which the excavation is to be made and show legal authority to occupy and use the street for that purpose; and (2), providing that no person, firm, or corporation shall exercise any franchise or privilege to lay or maintain pipes or conduits in or under any street of the city for the transmission of gas, water, heat, steam or other substance, without having first obtained a grant therefor from the city in accordance with the city charter and said ordinance, unless such person, firm, or corporation is entitled to do so "by direct and unlimited authority of the constitution of the state of California, or of the constitution and laws of the United States."

ID.—GAS COMPANY ESTABLISHED PRIOR TO AMENDMENT—ORDINANCES ENFORCEABLE AGAINST—EXCAVATING STREET NOT PREVIOUSLY USED. Such ordinances are valid and enforceable against a gas company excavating a trench in which to lay its gas-pipes in a street not before occupied or used by it for that purpose, notwithstanding the works of the company were established prior to the adoption of the constitutional amendment, and were built with the intent to supply gas in every section of the city, and of a size sufficient for that purpose.

ID.—CONSTITUTIONAL GRANTS—CONSTRUCTION IN FAVOR OF PUBLIC.—It is an established principle of construction, applicable to constitutions as well as to statutes, that grants thereby made to private persons or public service corporations of rights belonging to the state or to the public are to be construed most strongly in favor of the public.

ID.—RIGHTS OF GAS COMPANY IN STREETS PRIOR TO CONSTITUTIONAL AMENDMENT—USE OF PARTICULAR STREET ESSENTIAL TO ACQUISITION OF RIGHT—ACCEPTANCE OF OFFER.—Prior to the amendment of 1911 to section 19 of article XI of the state constitution, the privilege thereby granted to individuals or corporations of using the public streets or thoroughfares of a municipality and of laying down pipes and conduits therein for the purpose of supplying the city and its inhabitants with gas or other illuminating light, or with water, became effective as to any particular street of the municipality only upon its acceptance as to such street, manifested by the act of taking possession and occupying the street for the purposes allowed. The right offered was not intended to take effect in any street before it was actually used, or to vest as to all of them the moment that use was begun in good faith in one. Prior to the acceptance of such offer, the people had the right to repeal the constitutional provision and withdraw the offer.

ID.—RIGHT OF PEOPLE TO CHANGE CONSTITUTION BEFORE ACCEPTANCE—INVESTMENT OF MONEY IN GASWORKS—ESTOPPEL.—The investment of money in such gasworks designed to supply additional territory was not such an acceptance and could not operate as an estoppel against the state or the people to divest them of their sovereign authority to change the constitution. The company must be deemed to have had knowledge of this sovereign power and to have assumed the risk that the power might be exercised before it had further availed itself of the existing offer.

APPLICATION for a Writ of Habeas Corpus directed to the Chief of Police of the City of Los Angeles.

The facts are stated in the opinion of the court.

Chickering & Gregory, Trippet, Chapman & Biby, Gibson, Dunn & Crutcher, O'Melveney, Stevens & Milliken, Guy C. Earl, and H. H. Trowbridge, for Petitioner.

Green, Humphreys & Green, *Amici Curiae,* on petition for rehearing.

Guy Eddie, City Prosecutor, Ray E. Nimmo, Acting City Prosecutor, John W. Shenk, City Attorney of Los Angeles, William J. Carr, City Attorney of Pasadena, for Respondent.

Percy V. Long, City Attorney, and Thos. E. Haven, Assistant City Attorney, *Amici Curiae,* for the City and County of San Francisco.

SHAW, J.—The petitioner alleges that he is in custody upon a charge of having violated an ordinance of the city of Los Angeles.

The ordinance referred to was approved by the mayor on February 21, 1912. It declares that it shall be unlawful for any person, firm, or corporation to make any excavation in a street for any purpose without first obtaining permission in writing from the board of public works, and that before issuing the permit the board must require the applicant therefor to state the purpose for which the excavation is to be made and show legal authority to occupy and use the street for that purpose. A violation of any provision of the ordinance is declared to be a misdemeanor, punishable by fine or imprisonment, or both.

Another ordinance, approved October 26, 1911, provides that no person, firm, or corporation shall exercise any franchise, or privilege to lay or maintain pipes or conduits in or under any street of the city for the transmission of gas, water, heat, steam, or other substance, without having first obtained a grant therefor from the city in accordance with the city charter and said ordinance, unless such person, firm, or corporation is entitled to do so "by direct and unlimited authority of the constitution of the state of California, or of the constitution and laws of the United States."

On the tenth day of October, 1911, section 19 of article XI of the state constitution was amended. The city council passed these ordinances in the belief that by this amendment the city was given authority to forbid the use of public streets by public service corporations, unless the city should have first granted a franchise permitting such use. The petitioner was engaged in laying a gas-pipe in the street as a part of the distributing system of a corporation engaged in supplying gas to the inhabitants of the city, known as the Economic Gas Company. He claims, 1. That the gas company is directly authorized by said amendment to lay gas-mains in the street as part of its works for supplying gas, and, hence, that the city cannot forbid it from so doing; and, 2. That because of the fact that it had established its works, had laid some mains, and had begun supplying gas before the adoption of the amendment, it had a vested right to extend its mains and lay them in streets not before used by it for that purpose, a right

which the city could not restrict by ordinance, nor the people take away by constitutional amendment. These claims present the questions herein to be considered. We will take them up in the order stated:

1. Section 19 of article XI, as amended, is as follows: "Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communication. Such works may be acquired by original construction or by the purchase of existing works, including their franchises, or both. Persons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law, on condition that the municipal government shall have the right to regulate the charges thereof. A municipal corporation may furnish such services to inhabitants outside its boundaries; provided that it shall not furnish any service to the inhabitants of any other municipality owning or operating works supplying the same service to such inhabitants, without the consent of such other municipality, expressed by ordinance." [Stats. 1911, p. 2180.]

The first step in the application and interpretation of an amendment to a constitution or statute is to consider the conditions existing prior to its adoption, so as to ascertain its objects and purposes. At the time this amendment was adopted municipal corporations, unless specially authorized by charter, were without power to make or operate the several public utilities mentioned in the amended section. (*Von Schmidt* v. *Widber,* 105 Cal. 157, [38 Pac. 682]; *Hyatt* v. *Williams,* 148 Cal. 585, [84 Pac. 41]; *Platt* v. *San Francisco,* 158 Cal. 82, [110 Pac. 304].) Natural persons had full liberty to do so and private corporations could secure the power by filing the proper articles of incorporation. There had apparently arisen a general opinion among the people that municipal ownership and operation of such public utilities was desirable. Considering the language of the amendment in the light of these circumstances, its effect is plain. It is one of the evidences of a prevailing sentiment in favor of such municipal activities. It first makes to all municipal corporations a direct grant of power to make and operate public

works of the kinds enumerated. As to works of like kind to be operated privately, the design was to place them all in control of the municipality. Following out this design, the succeeding provision expressly limits the pre-existing powers and rights available to private corporations and natural persons. They are permitted to engage in such enterprises within the city only "upon such conditions and under such regulations as the municipality may prescribe."

The use of the word "regulations" as something distinct from "conditions," implies a broader meaning in the latter word than mere regulation of the manner of use. In ordinary use, in this connection, the word "condition" means something established "as a requisite to the doing or taking effect of something else." (Webster's Dict.) In law, it means "a qualification, restriction or limitation modifying or destroying the original act with which it is connected," or defeating, terminating or enlarging an estate granted. (1 Bouv. Dict., 382.) The conditions and regulations are to be such as the city "may prescribe under its organic law." There is no other qualification of the words. The conditions prescribed may therefore include every kind, conditions precedent, as well as conditions subsequent, if they may be made under the city charter. The charter of Los Angeles gives the city power to prescribe the character and quality of any public utility service, to fix the rate of compensation therefor, to regulate conduits and works or plants for the production, transmission, and distribution of gas, and to grant franchises or privileges in, on, across, under, or over the streets, and prescribe the terms thereof. If the taking effect of this constitutional provision in any city depends on the existence of provisions in its organic law giving the city power to make conditions, then these provisions of the Los Angeles charter give that city power to prescribe the conditions expressed in the ordinances above mentioned. But we think the provision itself, by necessary implication, gives each city power to prescribe conditions.

To give the city power to prescribe the conditions upon which persons and corporations may establish and operate such works, is to place the entire subject matter within the control of the city and, in effect, to provide that no such person or corporation may do so without obtaining the privilege

CLXIII Cal.—43

from the city by a grant specifying the conditions it chooses to prescribe. With respect to the mode of imposing and enforcing the conditions, the city is, of course, bound by the provisions of its charter. If conditions are found in the charter itself, the legislative authority of the city will be bound thereby and could not impose inconsistent conditions, nor abrogate those of the charter. In such a case the city would be imposing the conditions by its organic law and all grants by the city legislative body would be required to conform thereto. We need not here determine whether, in the absence of anything in the charter or city ordinances forbidding it, such persons or corporations, under their general powers, could go on to establish and operate such works without asking the consent of the city, or whether such action would be unlawful without affirmative permission from the city. It is sufficient for the disposition of this case to say that where the city has prescribed conditions, they must be observed, or the construction and operation of such works will be unlawful.

It is argued that this gives the city power to refuse to grant such franchises and that this would allow the city to create monopolies by limiting such grants to a single person or corporation, that this would be against public policy, and hence that this construction is not permissible. Opinions are variant upon the question whether, in the case of public utilities in cities, monopolies are, or are not, detrimental to the general good. In 1885, when section 19, as it stood prior to October 10, 1911, was adopted, the general opinion doubtless was against such monopolies. Subsequent experience of the effects of competition seems to have changed that opinion. This is clearly indicated in the statement in favor of this amendment printed on the ballots by which it was adopted. It declares that such utilities are by nature monopolistic. Its adoption upon such a statement of reasons is strong evidence of a change of public sentiment on the question. The general opinion now seems to be that where municipal ownership is not feasible or attainable, a properly regulated monopoly is advisable. The amendment shows an intention to allow this policy to be determined by each city in its own behalf. It may establish works of its own, excluding all others; it may permit but one system of works by refusing more than one franchise; or it may encourage competition

by allowing rival companies to enter the field, either in competition with its own system or with those of others.    We refer here to new systems, not to systems in operation prior to the amendment.

A consideration of the entire section in connection with all classes of public utilities mentioned therein shows that no other interpretation would be reasonable.    It applies throughout to works for supplying the city with light, water, power, heat, with transportation of freight or passengers, and with telephone service or other means of communication.    The claim of the petitioner is, in effect, that the third clause gives directly to every person or corporation desiring to establish and operate works of any of the kinds above mentioned the right to enter upon the streets of the city to establish and operate its system of works regardless of the wish or will of the city authorities, and that the power of the city to prescribe conditions is confined to such conditions as relate merely to the manner of establishing and operating the systems.    If this is the effect of the clause, then the amendment greatly enlarges, instead of restricting, the privileges given directly to private persons and corporations in the streets. Formerly the right to use them extended only to water and lighting systems; now, if this claim is correct, the right vests in all persons and all corporations for the purposes mentioned. The right could be exercised after the city had established its own works as well as before.    It would be unlimited with respect to the number of rival establishments.    New street-car lines could parallel existing lines, not only upon different streets, but upon the same streets, if there was space for another track.    The city could only make conditions as to the manner of laying the track and operating the cars, and it would be a necessary qualification that the conditions must be reasonable and not of a character which would prevent the use or unreasonably restrict it.    To give the amendment this meaning would make it almost the direct opposite of what it has been generally supposed to be.    It is apparent, of course, that the language is not as clear to the contrary as it could be made in view of the claim here presented.    But it is reasonably susceptible of the intepretation we have given it and we are satisfied that this construction is consistent with and in furtherance of its general intent and policy.

We have high authority to the same effect. In *Pomona* v. *Sunset etc. Co.*, 224 U. S. 330, [56 L. Ed. 788, 32 Sup. Ct. Rep. 477], decided April 8, 1912, this provision was construed by the supreme court of the United States. The claim was substantially the same as that here made. It was urged that this provision constituted a grant to the telephone company of the right to use the streets of Pomona as a place on which to erect its poles and string its wires. That court dismissed the claim with this statement: "If the municipal corporation does not see fit to establish the public works itself, it may let others do it, but its power to impose conditions excludes the notion that the constitution alone is a grant to others of a right to occupy the streets without its consent."

The ordinances are therefore valid and enforceable against the gas company and the petitioner as its employee, unless the claim that it has a vested right to extend its pipes is well taken. This brings us to the second question.

2. As a foundation for the second proposition, the petitioner shows that the works of said company were established and operated with the intent to supply gas in every section of the city and to lay pipes in every street, if necessary for that purpose; that to this end it constructed works of a size sufficient to supply gas to a much larger territory than it was supplying prior to October 10, 1911, and had expended in so doing one hundred thousand dollars more than would have been required for works to supply only the territory reached by its pipes at that date; that it had laid and maintained its pipes in many streets of the city and had supplied gas thereby to the inhabitants in such streets for more than two years before said date; that prior to said date said company had made contracts with many of the inhabitants of the city to supply gas to them; that said contracts were still in force, and that, in order to perform them, it must extend its mains into streets not before used by it. All its works before that date were constructed in accordance with the provisions of the constitution existing prior to said amendment and in compliance with the existing regulations and directions of the city authorities. The petitioner was excavating a trench to lay gas-pipes for said company in a street not before occupied or used by it for that purpose.

Prior to October 10, 1911, section 19 of article XI was as follows:—

"In any city where there are no public works owned and controlled by the municipality for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose, under and by authority of the laws of this state, shall, under the direction of the superintendent of streets, or other officer in control thereof, and under such general regulations as the municipality may prescribe, for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight, or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof."

The grant or offer set forth in this section is in the most general terms. It is not specific with respect to either places or persons. It is not made to a particular corporation, nor is it confined to any particular city. It is a general offer to any person and all corporations that may be organized for that purpose and it embraces all cities in the state. It is specific only with regard to the kind of privilege offered, to wit: that of "using the public streets" and "laying down pipes and conduits therein . . . so far as may be necessary for introducing into and supplying said city and its inhabitants" with gas or water. No provision is made for any formal or written acceptance of the offer whereby a conveyance of a right to specified streets or within specified limits, or to all the streets of the particular city, might be manifested, which would be in the nature of a conveyance vesting the right in advance of, and regardless of, its use. No officer is empowered to take, receive, record, or preserve such acceptance. The only means whereby an effectual manifestation of acceptance can be made is the act of taking possession and occupying the street for the purpose allowed. Then, and not before, is the acceptance complete. Thus far the public grant extends, thus far the public property in the street is burdened and diverted to another use, thus far the grant is

accomplished. There is nothing in the language of the section which can be fairly said to express the intention that the right offered should take effect in any street before it is actually used, or should vest as to all of them the moment that the use is begun in good faith in one.

It is an established principle of construction, applicable to constitutions as well as to statutes, that grants thereby made to private persons or public service corporations of rights belonging to the state or to the public "are to be construed most strongly in favor of the public." (*Clark* v. *Los Angeles,* 160 Cal. 39, [116 Pac. 725]; *Sunset etc. Co.* v. *Pasadena,* 161 Cal. 273, [118 Pac. 799].) "Only that which is granted in clear and explicit terms passes" by such grant. "Nothing passes by implication." (*Knoxville Water Co.* v. *Knoxville,* 200 U. S. 33, [50 L. Ed. 353, 26 Sup. Ct. Rep. 224].) The grant to be made effective by actual use and acceptance of the constitutional offer, is not, under the rule of construction just stated, to be carried further by implication. It is a necessary conclusion, therefore, that the vested right of the Economic Gas Company in the streets of Los Angeles at the time the constitution was changed, extended so far only as its actual occupancy and use of the streets then extended. The people had the right, at any time before acceptance, to repeal the provision and withdraw the offer. The investment of money in gasworks designed to supply additional territory was not an acceptance and could not operate as an estoppel against the state or the people to divest them of their sovereign authority to change the constitution. The company must be deemed to have had knowledge of this sovereign power and to have assumed the risk that the power might be exercised before it had further availed itself of the existing offer.

The section has heretofore been considered, in some of its aspects, by this court. In *People* v. *Stephens,* 62 Cal. 209, its effect as an executed and completed grant of the right to lay pipes in the public streets was the question involved. It was held that no legislative action was necessary to give it force; that it constituted a direct grant from the people, through the constitution, to the corporation in charge of the public use of supplying gas or water, of the privilege of laying in the streets such pipes as were required to distribute the supply. The main question considered was that of the necessity of

legislative action to put the constitutional provision in force. In *In re Johnston,* 137 Cal. 115, [69 Pac. 973], it was decided that this constitutional grant gave to the corporation desiring to accept it the privilege granted, free from any interference or supervision by the municipality, other than that authorized by the terms of the section, and, hence, that the city could not require such corporation to procure a permit as a condition precedent to such use of the streets. (See, also, *South Pasadena* v. *Pasadena,* 152 Cal. 586, [93 Pac. 490].) In *Stockton etc. Co.* v. *San Joaquin County,* 148 Cal. 313, [7 Ann. Cas. 511, 5 L. R. A. (N. S.) 174, 83 Pac. 54], the decision was that this franchise or privilege, when accepted and used, is an incorporeal hereditament, an easement in the particular street and partaking of the realty, local in situation and taxable in the county in which the street is situated, the same as other real property, and that it is not one of, or a part of, the general corporate franchises to do business upon which corporations are taxable only in the county in which the principal place of business is situated. In none of these cases was it necessary to consider the extent of the franchise acquired by acceptance of the constitutional offer, that is to say, whether it was acquired and became vested only as far as it was used at the particular time to which the inquiry related, or whether it was a general present grant of a right or estate in all the streets to which the proposed system was designed to extend, and which vested as to all of them the moment it was accepted and used in one. There are expressions, however, in several of the decisions which show that the understanding of the court has been that the acceptance did not become complete otherwise than by actual use, nor extend further than such use, and that the right vested at the time of such use and not before. In *Stockton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 313, [7 Ann. Cas. 511, 5 L. R. A. (N. S.) 174, 83 Pac. 54], (318), speaking of such a franchise we said: "It is only acquired when the constitutional grant is actually accepted; when the pipes and conduits for gas or the electric poles are laid in or erected on the streets of the city." Corporations having the capacity to take "do not acquire it until they have accepted it by proceeding to its actual exercise." Such franchise "is indissolubly annexed to the street of a city in and upon which it is exercised." In

*South Pasadena* v. *Pasadena*, 152 Cal. 586, [93 Pac. 490], we said: "This right, when made available by actual possession and use, is a species of real property, appropriately designated as a franchise." The point decided in *Western Union Tel. Co.* v. *Hopkins*, 160 Cal. 111–122, [116 Pac. 559–564], is, in principle, decisive of the precise question here involved. Referring there to the similar legislative grant to telegraph companies to construct telegraph lines along the highways of the state, contained in section 536 of the Civil Code, the court says it is similar to the constitutional provision in question here, and that it "would vest only when actually accepted by the exercise of the right granted" (p. 111); that "the exclusive occupation by a company of portions of public highways for the authorized purpose is an acceptance by it of the offered franchise" (p. 117); that the statute was a grant of rights in streets "which to the extent that they were accepted and availed of by any company, constitute a franchise granted by the state and accepted by the company" (p. 119); and again: "To the extent that the offer of the state contained in the section was accepted by a telegraph company by the actual occupation of a highway prior to any repeal, modification or suspension of the section, no right of revocation having been reserved, such telegraph company has vested rights that cannot be taken away by the state or city without compensation" (p. 120); and further: "So far as any company had not at such time availed itself of and thus accepted the provisions of section 536, there was no 'existing' grant or franchise to be annulled, and there was never any 'special' or 'exclusive' privilege given by the section." (P. 123.) The part of the decision last quoted relates directly to the question whether the telegraph company, under the general legislative grant to all companies in any street, acquired any right in the streets in which it had not erected poles or strung wires prior to a repeal of the section, which such repeal would divest. It is practically the same question as that presented here and is authority for the proposition that the gas company had no vested rights in streets not previously used for the laying of gas-mains. To the same effect are *St. Louis* v. *Western Union Tel. Co.*, 149 U. S. 465, [37 L. Ed. 810, 13 Sup. Ct. Rep. 990]; *Northwest etc. Co.* v. *St. Charles*, 154 Fed. 388, and *Muscogee etc. Co.* v. *Hall*, 4 Ind.

Ter. 18, [64 S. W. 603]. There are cases involving grants of franchises in streets of a particular city to a particular person or corporation, which hold that a right vests in all streets as soon as the franchise is accepted, and that such acceptance may be manifested either by a formal written acceptance or by the actual exercise of the rights granted thereby. We do not consider these decisions authority upon the question here involved. The distinction between such a special grant of a described right and the general offer here involved is obvious.

For these reasons we are of the opinion that Economic Gas Company had no vested right to excavate in the new street or to lay pipes therein to extend its service into new territory within the city.

The petitioner is remanded to the custody of the chief of police of the city of Los Angeles.

Angellotti, J., Sloss, J., Lorigan, J., and Henshaw, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.