[S. F. No. 6724.    In Bank.—February 24, 1915.]

## ORO ELECTRIC CORPORATION, Petitioner, v. RAIL-ROAD COMMISSION OF THE STATE OF CALI-FORNIA, and JOHN M. ESHLEMAN et al., Members Thereof, Respondents.

RAILROAD COMMISSION—POWER OVER PUBLIC UTILITIES—PUBLIC UTILI-TIES ACT.—*Pacific Telephone and Telegraph Company* v. *Eshleman,* 166 Cal. 640, construing the constitutional amendments of 1911, relating to the railroad commission, and defining the authority of the legislature to confer powers upon the commission, the extent of the powers conferred by the Public Utilities Act of 1911, and the limitations imposed by that act upon the scope of review by state courts of the acts of the commission, is approved and followed.

ID.—CERTIORARI—REVIEW OF ORDER REFUSING CERTIFICATE OF PUBLIC CONVENIENCE—SUFFICIENCY OF EVIDENCE TO SUPPORT FINDING.—In a proceeding in *certiorari* before the supreme court to review orders made by the railroad commission in response to an application of an electric light and power corporation for a certificate of public convenience and necessity, authorizing the corporation to construct and operate lines for the transmission and sale of electric current for light and power purposes in a specified territory, as provided for in section 50 of the Public Utilities Act, (Stats. (Ex. Sess.) 1911, p. 43), the court cannot consider either the sufficiency of the evidence, or the soundness of the reasoning, upon which the railroad commission based their ultimate finding of fact that the public convenience and necessity did not require the exercise of the privileges applied for.

ID.—DISTINCTION BETWEEN FRANCHISE AND RIGHT TO OCCUPY STREET FOR PURPOSES OF CARRYING ON BUSINESS OF SUPPLYING ELECTRICITY. There is a distinction between a franchise, or grant of a right, to engage in the business of furnishing electric current, and the narrower grant of a right to occupy the streets of the city in carrying on that business. If the power of the city be limited merely to control the use of its streets in connection with a public service, the right to engage in such service being derived from some source other than a grant by the city, the power of the city would not be impaired by the provision of the Public Utilities Act requiring a certificate of public necessity and convenience as a condition precedent to the construction or extension of the plant or line of a public utility.

ID.—POWER OF CONTROL OVER STREETS—POWER TO GRANT CERTIFICATE OF PUBLIC CONVENIENCE—POWERS VESTED IN DIFFERENT GOVERN-MENTAL BODIES.—The granting or withholding of the certificate is

an exercise of the power of the state to determine whether the rights and interests of the general public will be advanced by the prosecution of the enterprise which it is proposed to carry on for the service of the public. This is an entirely different question from that of the local control of the streets, and power over the two subjects may be vested at the same time in different governmental bodies, without the one in any way clashing with or interfering with the other.

ID. — MUNICIPAL CORPORATIONS — CONTROL OVER PUBLIC UTILITIES— CONSTITUTIONAL RESERVATIONS—ELECTRIC LIGHT AND POWER COMPANY—NECESSITY OF OBTAINING CERTIFICATE OF PUBLIC CONVENIENCE TO OPERATE IN CITY OF STOCKTON.—Notwithstanding the reservation to incorporated cities of certain powers of control over public utilities, as declared in section 23 of article XII of the constitution and section 82 of the Public Utilities Act, the acquirement of a certificate of public convenience and necessity is a prerequisite to the right of an electric light and power company to engage in the business of furnishing electric light and power within the corporate limits of the city of Stockton.

ID.—CITY OF STOCKTON—CORPORATE POWERS NOT IMPAIRED BY EXERCISE OF POWERS OF RAILROAD COMMISSION.—Although the city of Stockton has not surrendered any of the powers over public utilities reserved to it by such provisions of the constitution and of the Public Utilities Act, it did not, either on December 23, 1911, the date when the Public Utilities Act was approved, or ninety days thereafter, when the act took effect, have any powers which would be impaired by the exercise by the railroad commission of the power to grant or withhold a certificate of public convenience to an electric light and power company seeking the same in order to entitle it to engage in the business of furnishing electric light and power within the limits of that city.

ID.—CHARTER OF CITY OF STOCKTON OF 1911 SUBJECT TO PUBLIC UTILITIES ACT.—Under section 170 of the charter of the city of Stockton of 1911, (Stats. 1911, Ex. Sess. p. 302), that charter for all purposes other than the nomination and election of officers, and taxation and assessment, did not go into effect until a date later than that upon which the Public Utilities Act became effective.

ID.—CHARTER OF 1889—POWER TO GRANT FRANCHISE TO ELECTRIC LIGHT AND POWER COMPANY NOT CONFERRED.—The city of Stockton, under its freeholder's charter of 1889 by which it was governed at the time the Public Utilities Act took effect, (Stats. 1889, p. 577; Amended, Stats. 1905, p. 832), had no power to grant a franchise which would authorize the grantee to engage in and carry on the business of furnishing electricity for light and power to the inhabitants of the city.

ID.—CONSTRUCTION OF GRANTS OF POWER TO MUNICIPAL CORPORATIONS.— Language purporting to define the powers of a municipal corporation

is to be strictly construed, and any fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied. Such corporation possesses and can exercise only those powers which are either; (1) granted in express words; or (2) necessarily or fairly implied in or incident to the powers expressly granted, or (3) essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable.

Id.—Limitations on Powers of City of Stockton With Respect to Electric Lighting.—Construed in accordance with the foregoing rules, the provisions of the charter of the city of Stockton of 1889, go no further than to assert the city council's control over the streets, its power to regulate the laying of wires and the erecting of lights in or upon such streets, to provide for the lighting of the streets, and to fix the rates to be charged for lighting.

Id.—Power to Grant Franchises for Expressed Purposes—Limitations on Implied Powers.—The specific provisions contained in subdivisions 28 and 34 of section 30 of the charter of the city of Stockton of 1889, as amended in 1905, conferring express powers on the city council to grant franchises for the purposes of steam and street railroads, operate to limit the power of the municipality to grant franchises to electric corporations, which might otherwise be inferred or implied from the general words of the charter touching control of the streets and the making of rules and regulations of a local, police, and sanitary character.

Id.—Constitutional Grant of Right to Use Streets for Lighting Purposes.—The conclusion that those who framed and adopted such charter of 1889, and the amendments of 1905, did not intend to vest in the city power to authorize private persons or corporations to enter into the business of furnishing light to the inhabitants, or even to use the streets of the city for that purpose, is strengthened by a consideration of section 19 of article XI of the constitution, as then in force, by which any individual or company incorporated for that purpose was given the privilege, in cities which had no public light or waterworks, of using the public streets, and of laying down pipes and conduits therein, for the purpose of supplying the city and its inhabitants with light and water.

Id.—Amendment of 1910 to Section 19 of Article XI of Constitution—Cities not Granted Power to Regulate Public Utilities. Section 19 of article XI of the constitution as amended in 1910 and in force when the Public Utilities Act took effect, which after declaring the rights of municipalities to establish and operate their own works for certain public utilities, including light and power, provides that "persons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law, on condition that the municipal gov-

ernment shall have the right to regulate the charges thereof," does not, *ex proprio vigore,* give to all cities the power to regulate public utilities operating within their borders; it merely places the utilities under such control as may be provided for by the charter or other organic law of the city. It does not constitute a grant of unlimited or specific power over such utilities (except in the matter of rates), to any city whose organic law contains no provision for the exercise of such power.

Id.—Broughton Act—Power to Grant Franchises not Conferred.— The so-called Broughton Act (Stats. 1905, p. 777), does not give to every city authority to grant franchises for transmitting electric light and power. Such act merely places restrictions upon the granting of franchises, where the power to grant such franchises exists otherwise.

APPLICATION for a Writ of Certiorari directed to the Railroad Commission of the State of California.

The facts are stated in the opinion of the court.

Samuel Knight, Goodfellow, Eells & Orrick, C. L. Neumiller, and E. I. Jones, for Petitioner.

Max Thelen, and Douglas Brookman, for Respondents.

Chickering & Gregory, Cummins, Stearns & Milkwitch, Nutter & Orr, H. H. Trowbridge, O'Melveny, Stevens & Milliken, Gibson, Dunn & Crutcher, A. H. Sweet, Charles P. Cutten, and Short & Sutherland, *Amici Curiae,* in behalf of Respondents.

SLOSS, J.—This is a proceeding in *certiorari,* to review certain orders made by the railroad commission in response to an application of the Oro Electric Corporation for a certificate of public convenience and necessity, authorizing said corporation to construct and operate lines for the transmission and sale of electric current for light and power purposes in the city of Stockton and in certain other parts of San Joaquin County. The certificate so sought is provided for in section 50 of the Public Utilities Act (Stats. (Ex. Sess.) 1911, p. 43). This section declares that no street railroad corporation, gas corporation, electrical corporation, telephone corporation, or water corporation shall begin the construction of a street railroad, line, plant, or system, or of any extension thereof "with-

out having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction.''

At the time of its application, the Oro Electric Corporation had not entered the field which was to be covered by the certificate sought. The Western States Gas and Electric Company was occupying that field, and it appeared before the commission to oppose the granting of the certificate to the Oro corporation. The railroad commission first, on April 29, 1913, made an order in favor of the applicant so far as concerned the territory outside of the city of Stockton, excepting a described region adjacent to the city. With reference to the city and the excepted adjacent tract, it gave to the Western States Company a period of ninety days within which to complete certain pending work of reconstruction and to present reduced rates that should be satisfactory to the commission. The order declared that, if these conditions were complied with, the application of the Oro Company would be denied; otherwise it would be granted. After the ninety days had expired, on August 15, 1913, the commission made its final order reciting that the Western States Company had complied with the conditions of the prior order, and refusing the certificate that public convenience and necessity required that the Oro corporation be authorized to sell electricity in the city of Stockton and the adjacent territory described in the order of April 29, 1913. It is sought by this proceeding to annul these two orders.

The attack upon the acts of the commission was, in the opening brief, based upon a variety of grounds. But, as the proceeding progressed through the successive stages leading to final submission, the matter in dispute was virtually narrowed down to the single question whether, under the reservation to incorporated cities of certain powers of control over public utilities, as declared in section 23 of article XII of the constitution and section 82 of the Public Utilities Act, the acquirement of a certificate of public convenience and necessity was a prerequisite to the right of the petitioner to engage in the business of furnishing electric light and power within the city of Stockton. The other questions originally raised by the petitioner have been, in effect, determined against it by the decision of this court in *Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640, [Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.)

652, 137 Pac. 1119], rendered since this proceeding was instituted. In that case the constitutional amendments of 1911, relating to the railroad commission and the authority of the legislature to confer powers upon such commission, were carefully considered and analyzed. The members of the court who participated in that decision, while differing on some of the questions presented, united in an interpretation of section 23 of article XII of the constitution of the state which cuts the ground from under the petitioner's claims: 1. That section 50 goes beyond the powers of supervision and regulation which the legislature may, under said section 23, confer on the railroad commission; and, 2. That the requirement of a certificate of public necessity and convenience constitutes an improper delegation of legislative functions to the commission. And the same decision fully answers the argument that, on the merits, the commission was not justified in denying the requested certificate. The validity of section 67 of the Public Utilities Act, in so far as it limits the scope of review by state courts of the acts of the commission, must be regarded as finally settled by the telephone company case. By that section, the findings and conclusions of the commission on questions of fact are made final and not subject to review. Here the commission found the ultimate fact that the public convenience and necessity did not require the exercise of the privileges in controversy, and neither the sufficiency of the evidence, nor the soundness of the reasoning, upon which that finding was based, can be considered on this proceeding.

We are thus brought to the inquiry, already mentioned, whether the power to grant or withhold a certificate of public convenience, conferred upon the railroad commission by section 50 of the act, was inoperative within the city of Stockton by reason of the limitations contained in section 23 of article XII of the constitution and section 82 of the Public Utilities Act.

Section 23 of article XII declares that every person or corporation engaged in operating any one of certain enumerated enterprises, including the furnishing of light or power to or for the public, is a "public utility subject to such control and regulation by the railroad commission as may be provided by the legislature." It goes on to provide that from and after the passage by the legislature of laws conferring powers upon the railroad commission respecting public utilities, all

powers respecting such public utilities vested in boards of supervisors, or municipal councils, or other governing bodies of counties or municipalities, shall cease so far as they conflict with the powers conferred upon the commission; "provided, however, that this section shall not affect such powers of control over any public utility vested in any city and county, or incorporated city or town as, at an election to be held pursuant to laws to be passed hereafter by the legislature, a majority of the qualified electors voting thereon of such city and county, or incorporated city or town, shall vote to retain, and until such election such powers shall continue unimpaired . . . " Section 82 of the Public Utilities Act is in substance identical with the proviso just quoted.

By an act approved January 2, 1912 (Stats. (Ex. Sess.) 1911, p. 168), the legislature provided for the elections contemplated by the proviso. No such election has been held in Stockton and that city has, consequently, not surrendered any of the powers over public utilities reserved to it by the constitution and the Public Utilities Act. Did it, on December 23, 1911, the date when the Public Utilities Act was approved, or ninety days thereafter, when the act took effect, have any powers which would be impaired by the exercise of the power sought to be exercised by the railroad commission in this case?

On December 30, 1912, the city council of Stockton passed an ordinance granting to the Oro Electric Corporation a franchise to construct and operate under and along the streets and public places of the city conduits, poles, wires, and other appliances for transmitting and furnishing electricity for light, heat, and power. It is not necessary to enter into an examination of the scope of the franchise thus actually granted, for, as is pointed out in the briefs, the important consideration is not what the city did, but, rather, what it had power to do. We must first inquire whether the city of Stockton had power, when the Public Utilities Act took effect, to grant a franchise which would authorize the grantee to engage in and carry on the business of furnishing electricity for light and power within the city. If this question be answered in the affirmative, and in that event only, does it become necessary or proper to inquire whether the exercise of this power in the city is impaired by the provisions of section 50 of the Public Utilities Act.

The present proceeding has been heretofore decided by this court and is now before us pursuant to an order for rehearing. On the original submission the respondents did not question the power of the city to grant franchises for the distribution and sale of electricity. Indeed, the brief filed on behalf of the commission expressly conceded the existence of such power, and no doubt of the propriety of this concession was suggested by other counsel appearing to oppose the relief sought by the writ. The petitioner, in its opening brief, had claimed that the city possessed this power, both under a freeholders' charter approved by the legislature on December 20, 1911, (Stats. (Ex. Sess.), 1911, p. 254), and under the preexisting charter and other law defining the powers of the city. Under these circumstances, this court did not feel called upon to make a minute examination of the point. Relying upon the concession of the respondents, it contented itself, in the opinion heretofore filed, with a reference to the charter of 1911, stating that "it is admitted that this charter conferred upon the city the power to grant franchises to corporations to engage in the business of supplying electricity to the inhabitants of the city and to erect poles, wires, and conduits in the streets for that purpose . . . " The other questions in the case were then treated on the assumption that the admission of counsel was based upon a correct reading of the charter.

Petitions for rehearing were filed and in these petitions it was urged for the first time that the charter of 1911 had no application to the case, for the reason that by section 170 of that instrument (Stats. (Ex. Sess.), 1911 p. 302), it was provided that, for all purposes other than the nomination and election of officers, and taxation and assessment, the charter did not go into effect until a date later than that upon which the Public Utilities Act became effective. The point was well taken, and, notwithstanding its belated presentation, the court concluded that the public importance of the question demanded a rehearing, without regard to the merit of other grounds of attack upon the decision rendered.

We are now, accordingly, required to examine the various provisions, whether of statute, charter, or constitution, governing the city of Stockton prior to the adoption of the charter of 1911, and to ascertain whether, under those provisions, the city had any power over electric corporations which would

be impaired by the exercise of the power conferred upon the railroad commission by section 50 of the Public Utilities Act.

Prior to the enactment of the last mentioned act, the city of Stockton was governed under a freeholders' charter, approved in 1889 (Stats. 1889, p. 577) and amended in 1905 (Stats. 1905, p. 832). That charter contained the following provisions, some or all of which, according to petitioner's claim, conferred authority to grant a franchise or right to engage in the business of selling electric current to inhabitants of the city of Stockton.

By sections 146 and 147 the department of streets was placed in the control of the city council and was declared to embrace "the control of the streets . . .; of the public grounds; of the lighting of streets and public buildings, and of everything of a public nature pertaining to said subjects." . . . Section 30 conferred upon the council power to pass ordinances:

"3. To regulate the laying of telegraph or telephone wires in or upon the public streets, erecting of gas and electric lights therein, . . . the use of streets and sidewalks for . . . telegraph posts, and other purposes."

"5. To provide for and regulate . . . lighting . . . of the streets, avenues and public places."

"17. To provide for . . . such . . . lights . . . and other supplies of any kind necessary for the convenient transaction of public business."

"25. To . . . determine the maximum rate or compensation to be charged by any person, company or corporation supplying gas, electric or other illuminating power in this city" . . .

"26. To regulate the quality, capacity and location of electric wires, water and gas-pipes, mains and fire-plugs, and to provide for and regulate the construction and repair of hydrants . . . and such other appliances as may be requisite to utilize the distribution of water, electricity and gas in the streets, public places and public buildings."

"28. To grant franchises permitting any company or corporation to lay and maintain tracks, and to pass, with steam railroads . . . along, upon and across . . . any streets of the city" . . .

"34. To grant franchises for the construction of street railroads on and along the streets of the city."

"46. To make all rules and regulations necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this charter or by general laws in said city."

"47. To make and enforce all such local, police, sanitary and other regulations as are not in conflict with general laws and the provisions of this charter."

"51. To acquire, construct, purchase, lease, own, control, maintain and operate such public utilities and properties as shall be deemed to be for the best interests of the city."

Section 202 contained a general provision requiring a grant of a franchise to be in specific terms, and declaring a forfeiture for nonuser.

Before proceeding to an analysis of these provisions, it will be well to refer briefly to the distinction, drawn by counsel against the petitioner, between a franchise, or grant of a right, to engage in the business of furnishing electric current, and the narrower grant of a right to occupy the streets of the city in carrying on that business. On the former hearing, it was, as we have already stated, taken as conceded that the city of Stockton had the power to grant franchises *"to engage in the business,"* as well as to "erect poles, wires, etc., in the streets for that purpose." It thus became unnecessary to consider whether section 50 of the Public Utilities Act "impaired" the power of a city, if that power extended merely to control of the use of its streets in connection with a public service, the right to engage in such service being derived from some source other than a grant by the city. If the power of a city were thus limited, we think it is entirely clear that the power would not be impaired by the provision of the Public Utilities Act requiring a certificate of public necessity and convenience as a condition precedent to the construction or extension of the plant or line of a public utility. The granting or withholding of the certificate is an exercise of the power of the state to determine whether the rights and interests of the general public will be advanced by the prosecution of the enterprise which it is proposed to carry on for the service of the public. (See *People* v. *Willcox*, 207 N. Y. 86, [45 L. R. A. (N. S.) 629, 100 N. E. 705].) This is an entirely different question from that of the local control of the streets, and power over the two subjects may well be vested at the same time in different

governmental bodies, without the one in any way clashing with or interfering with the other. The railroad commission might grant a certificate authorizing a public utility to engage in its business in a given city, but the certificate would not authorize the use of the streets, unless the right to so use them had been given by the authority vested with the power to grant such right. This is recognized by subdivision (c) of section 50 itself, where we find an express provision that the applicant shall furnish to the commission evidence that the required local consent, franchise or permit has been obtained. On the other hand the fact that a city may, in the exercise of its control over its own streets, give or withhold the right to use its streets, has no direct bearing upon the power to decide whether or not a given business, in the conduct of which the use of the streets may be convenient or necessary, shall be carried on. Where there is this limited control, its exercise is not impaired by legislation under which the state reserves to itself the determination of how far, if at all, the given business may be conducted. The city's powers are fully preserved if its streets are not occupied except by its consent, given as may be provided by law.

Different considerations might prevail where a city had power to confer the right, not only of using the streets, but of conducting a public utility occupation within the municipal borders. This was the situation which, by reason of the concession of the respondents, we were called upon to consider in our former opinion. But since, as will presently appear, we are now satisfied that the charter and other provisions actually in force at the time when the Public Utilities Act took effect gave the city, at most, the limited power above mentioned, i. e., nothing more than the power to grant to electric corporations, the right to use its streets, there is no occasion to reconsider, as we are asked to do, the correctness of the views expressed under the mistaken assumption that the city had power to grant franchises to carry on the business of selling electricity to the inhabitants, as well as to use the streets for that purpose. The impropriety of deciding anything more than is necessary to the decision gains added force, in this instance, from the circumstance that, during the pendency of this case, the proviso to section 23 of article XII has been altered by constitutional amendment approved in November, 1914.

We return to a review of the provisions of the Stockton charter of 1889.

It is thoroughly settled that language purporting to define the powers of a municipal corporation is to be strictly construed, and that any "fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied." (1 Dillon on Municipal Corporations, sec. 89.) This rule has been clearly announced by this court in various cases, of which it will suffice to cite *Von Schmidt* v. *Widber,* 105 Cal. 151, [38 Pac. 682], and *Hyatt* v. *Williams,* 148 Cal. 585, [84 Pac. 41]. In the latter case the question was whether, under the very charter we are now considering (as it read prior to the amendments of 1905, by which, among other changes, subdivision 51 was added to section 30), the city of Stockton had power to maintain works for the purpose of supplying the inhabitants of the city with electric light. The application of the rule of strict construction led to a denial of the existence of the power. In both *Von Schmidt* v. *Widber* and *Hyatt* v. *Williams,* it was declared as a "general and undisputed proposition of law," quoting from 1 Dillon on Municipal Corporations, sec. 85m (5th ed., sec. 237), that "a municipal corporation possesses and can exercise the following powers and no others: 1. Those granted in express words; 2. Those necessarily or fairly implied in or incident to the powers expressly granted; and 3. Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable."

Using the mode of construction thus indicated, we find in the charter under discussion no language giving power to grant franchises to furnish electric light and power to the inhabitants. Certainly such power is not granted in express terms. Nor can it be said to be either "necessarily or fairly implied in or incident to" the powers expressly granted, or "essential to the declared objects and purposes of the corporation." The charter provisions which we have quoted go no further than to assert the city council's control over the streets, its power to regulate the laying of wires and the erecting of lights in or upon such streets, to provide for the lighting of the streets, and to fix the rates to be charged for lighting.

It may be conceded that the broad grant of power to control and regulate the streets would, if standing alone, be sufficient to confer authority to determine whether or not the streets may be occupied by light or water companies in furnishing service to the inhabitants and to grant franchises authorizing such occupancy. (*City of Owensboro* v. *Cumberland T. & T. Co.*, 230 U. S. 58, [57 L. Ed. 1389, 33 Sup. Ct. Rep. 988].) So, too, the general grant of authority found in subdivisions 46 and 47 of section 30 of the charter might, if unrestrained by more specific provisions, suffice to empower the city council to grant such franchises to corporations organized to furnish water or light. (See *City of Joseph* v. *Joseph Water Works Co.*, 57 Or. 586, [111 Pac. 864, 112 Pac. 1083] ; *Andrews* v. *National Foundry, etc. Co.*, 61 Fed. 782, [10 C. C. A. 60] ; *Lewis* v. *City of Newton*, 75 Fed. 884; *Pike's Peak Power Co.* v. *Colorado Springs*, 105 Fed. 1, [44 C. C. A. 333].) But an entirely different position is presented when it is observed that subdivisions 28 and 34 of section 30 make specific and express provision for the grant of franchises for steam and street railroads. There is no express grant of power to confer franchises for furnishing light or power, or for any purposes other than the two specified. The case thus falls within the established rule that where a municipal charter "authorizes the enactment of by-laws in certain specified cases, and for certain purposes; and after this specific enumeration a general provision is added, that the corporation may make any other by-laws or regulations necessary to its welfare, good order, etc., . . . the power which the corporation would possess under . . . the 'general welfare clause,' *if it stood alone,* may be limited, qualified, or, when such intent is manifest, taken away by provisions specifying the particular purposes for which by-laws may be made." (2 Dillon on Municipal Corporations, 5th ed., sec. 585.) Here the power to grant franchises to electric corporations could, at best, be said to be drawn by inference or implication from the general words of the charter · touching control of the streets and the making of rules and regulations of a local, police, and sanitary character. Under the rule of interpretation to which we have just adverted, these general words will not be given the effect of extending power over a given subject covered by the charter, (i. e., franchises) to a class of cases outside of those embraced within the grant. The prin-

ciple is well illustrated in *City of St. Louis* v. *Bell Tel. Co.,* 96 Mo. 623, [9 Am. St. Rep. 370, 2 L. R. A. 278, 10 S. W. 197]. The city had undertaken, by ordinance, to regulate and limit telephone charges. The charter conferred power to "license, tax and regulate" persons engaged in a large number of specified occupations, "and all other business, trades, avocations or professions whatever." Telephone companies are not included in the enumeration, but telegraph companies are. The court held that such companies are "*ejusdem generis*" with telegraph companies and therefore included in the words of the final clause. The opinion then considers whether the power to "regulate" gives the right to fix rates. This question was answered in the negative, the court basing its conclusion upon the fact that the charter gives express power to establish ferry rates; to fix the rates for carriage of persons, and of wagonage, drayage, and cartage of property; to regulate the price of gas, and to regulate and control railways within the city as to their fares, hours, and frequency of trips. "These express powers to fix prices, fares and charges, in these specified cases," says the court, "are followed by no general words. With this specific enumeration of cases where the city may regulate the compensation to be charged, it impliedly appears that such a power was not intended to be given in other cases." Finally, it is held that the result is not affected by a "general welfare" clause contained in the charter.

In *City of Stillwater* v. *Lowry,* 83 Minn. 275, [86 N. W. 103], the question was whether villages having a population of less than three thousand had power to grant franchises for street railways. The statute conferred upon the councils of such villages authority to lay out, open, or change streets, to prevent the encumbering of streets, to ordain and establish "all such ordinances and by-laws for the good government and order of the village, . . . the protection of public and private property, the benefit of trade and commerce . . . as they shall deem expedient"; to make, erect, establish, and control waterworks; also to build and control electric-light plants, and to govern the streets, highways, and public places. While conceding that power to control and govern the streets might, in itself, be sufficient to authorize the council to permit the use of streets for street railway purposes, the court concludes that no such authority was given by the particular

statute in question, for the reasons, (1) that power to provide for railways is expressly given to other municipalities; and, (2)—a ground directly applicable here—that the express grant of power to authorize water and light plants indicates that power to authorize street railways was not intended to be covered by the general grant of power to control the streets.

The view that those who framed and adopted the Stockton charter of 1889, and the amendments of 1905, did not intend to vest in the city power to authorize private persons or corporations to enter into the business of furnishing light to the inhabitants, or even to use the streets for that purpose, is strengthened by a consideration of the constitutional provisions then in force. By section 19 of article XI, as it read when this charter was made and amended, any individual or company incorporated for that purpose was given the privilege, in cities which had no public light or waterworks, of using the public streets, and of laying down pipes and conduits therein, for the purpose of supplying the city and its inhabitants with light or water. The only limitations upon the privilege were that the city might, through its appropriate officer, have direction of the work in the streets, and might make regulations for damages and regulate charges. Here was a direct grant or offer of a grant by the state, to all who chose to avail themselves of it, of all substantial rights included in a franchise to operate a light or water plant in every city in the state. (*In re Johnston,* 137 Cal. 115, [69 Pac. 973]; *Stockton Gas & E. Co.* v. *San Joaquin,* 148 Cal. 313, [7 Ann. Cas. 511, 5 L. R. A. (N. S.) 174, 83 Pac. 54]; *People* v. *Los Angeles etc. Gas Co.,* 150 Cal. 557, [89 Pac. 108]; *Ex parte Keppelmann,* 166 Cal. 770, [138 Pac. 346].) While this constitutional provision remained in force, its effect could not be destroyed by statute or charter. Indeed, the rights conferred by it, when once vested by an entry upon the streets and the furnishing of light or water, could not be taken away by amendment or repeal of the constitutional grant. (*Ex parte Keppelmann,* 166 Cal. 770, [138 Pac. 346]; *Russell* v. *Sebastian,* 233 U. S. 195, [Ann Cas. 1914C 1282, 58 L. Ed. 912, 34 Sup. Ct. Rep. 517].) There was every reason, therefore, for omitting from the charter any provision authorizing the grant of franchises by the city to light or water companies.

Section 19 of article XI of the constitution was amended in 1910, and the amended section was in force when the Public Utilities Act took effect. It is contended by the petitioner that, regardless of the Stockton charter, the amended constitutional provision gave to every city the power to grant franchises of the character here involved. The amendment evidenced a change in the policy which the state had declared in adopting the constitution of 1879, the policy, that is to say, of "making these grants (of franchises to use the streets for distributing water and light) directly through the constitution itself instead of permitting them to be made by the legislature or by municipalities acting under legislative authority." (*Russell* v. *Sebastian,* 233 U. S. 195, [Ann. Cas. 1914C, 1282, 58 L. Ed. 912, 34 Sup. Ct. Rep. 517].) The amended provision, after declaring the right of municipalities to establish and operate their own works for certain public utilities, including light and power, goes on to state that "persons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law, on condition that the municipal government shall have the right to regulate the charges thereof." The language just quoted has been considered by this court in *Matter of Russell,* 163 Cal. 668, [Ann. Cas. 1914A, 152, 126 Pac. 875]. Our judgment in the case was reversed by the supreme court of the United States in *Russell* v. *Sebastian,* but the only question presented to that court was the extent of the rights vested in corporations which had occupied the streets of a city prior to the amendment of section 19 of article XI. On the construction of the section, as amended, and its application to utilities which had not undertaken to commence operations while the old section was in force, our decision in *Matter of Russell* remains unaffected by the action of the higher court. The claim of the petitioner in that case was that the new section made a direct grant to persons or corporations of the right to enter upon the streets of a city to operate the works specified in the section subject only to the power of the city to prescribe conditions relating to the manner of establishing and operating the works. With that interpretation this court did not agree. After reviewing the conditions which had existed before the amendment, we concluded that section 19

of article XI had been changed for the very purpose of declaring a new policy with respect to public utilities in cities. Instead of seeking, as the old section had done, to destroy the possibility of monopoly, the new section was adopted under the influence of an opinion, more or less generally held, that public utilities in cities should be conducted either by the municipality or by a properly regulated monopoly. "The amendment," says the court in the Russell case, "shows an intention to allow this policy to be determined by each city in its own behalf." The intention is found in the provision that the work may be established and operated upon such conditions and under such regulations as the municipality may prescribe. The conditions and regulations are to be such as the municipality may prescribe "under its organic law." It seems clear to us that this language contemplates a power of control exercised, either in accordance with conditions and regulations defined in the organic law itself, or in accordance with conditions and regulations defined by some municipal agency to which the necessary authority has been given by the organic law of the city. In other words, the section does not, *ex proprio vigore,* give to all cities the power to regulate public utilities operating within their borders; it merely places the utilities under such control as may be provided for by the charter or other organic law of the city. The contrary view was suggested in *Ex parte Russell,* but a positive expression on the point was said to be unnecessary, since in that case the charter of the city in question (Los Angeles) contained adequate provisions respecting the granting of franchises. After a further study of the new section, we cannot believe that the words conferring on cities a power to control certain public utilities "under their organic law" constitutes a grant of unlimited or specific power over such utilities (except in the matter of rates), to any city whose organic law contains no provision for the exercise of such power. It would follow, from the foregoing, that the amendment of section 19 of article XI did not vest in the city of Stockton any power which would be impaired by section 50 of the Public Utilities Act.

Finally, the petitioner claims that the "Broughton Act" (Stats. 1905, p. 777), gave to every city authority to grant franchises for transmitting electric light and power. But we think it clear that this act merely places restrictions upon

the granting of franchises, where the power to grant such franchises exists otherwise. As was said in *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265, 272, [118 Pac. 796], the "whole purpose" of the act "was to prescribe the method and conditions upon which the franchises included within its terms *might be* granted by the legislative body authorized by law to make the grant." The act does not authorize any board or council to grant a franchise.

The result of all that has been said is that, in our judgment, the city of Stockton did not, when the Public Utilities Act was passed or when it became effective, have power to grant to electric corporations franchises permitting them to furnish electricity to the inhabitants of the city, if, indeed, it had the power to grant the limited franchise or right to use the streets for that purpose. It follows that the requirement of a certificate of public convenience and necessity, contained in section 50 of the act, did not impair any power of control vested in the city. This conclusion disposes of the case, since it compels the holding that the railroad commission did not exceed its jurisdiction in taking cognizance of the application of the petitioner for a certificate or in denying such certificate.

The orders under review are affirmed.

Shaw, J. Henshaw, J., Lorigan, J., Melvin, J., and Angellotti, C. J., concurred.