**CITY AND COUNTY OF SAN FRANCISCO
v. UNITED STATES.**

No. 9055.

Circuit Court of Appeals, Ninth Circuit.
Sept. 13, 1939.

John J. O'Toole, City Atty., and Dion R. Holm, Asst. City Atty., both of San Francisco, Cal. (Robert M. Searls, of San Francisco, Cal., of counsel), for appellant.

Garret W. McEnerney, of San Francisco, Cal., amici curiae in support of appellant.

W. H. Metson and E. B. Mering, both of San Francisco, Cal., amici curiae.

Norman M. Littell, Asst. Atty. Gen., and William D. Donnelly, Atty., Department of Justice, of Washington, D. C. (Carl McFarland, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., and W. E. Licking, Asst. U. S. Atty., both of San Francisco, Cal., C. W. Leaphart, Sp. Asst. to Atty. Gen., and Robert H. Fabian, Atty., Department of Justice, of Washington, D. C., on the brief), for the United States.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from a decree of the District Court holding that the City and County of San Francisco, hereinafter called the "City", has violated Section 6 of the Raker Act[1] (38 Stat. 242, 245), by its dis-

---

[1] Section 6 of the Raker Act provides: "That the grantee is prohibited from ever selling or letting to any corporation or individual, except a municipality or a

posal of electric energy generated and transmitted through utilization of lands and rights granted to the City by the United States under the terms of that Act, and enjoining such violation. The Court also decreed that if the City should fail to comply with the injunction, "It shall be and hereby is enjoined and restrained from using for development and transmission of electric energy any of the lands, rights and privileges granted to it by plaintiff [the United States] by the Raker Act."

Before dealing with the contentions of the parties we will state the facts relevant to the controversy.

When the Raker Act was passed (December 19, 1913) San Francisco was a rapidly growing city in an area of comparatively small rainfall, with a small run-off from the neighboring hills which was impounded, distributed and sold to the people of San Francisco by a private corporation, the Spring Valley Water Company, under a "constitutional franchise", by means of water mains and other distributing facilities installed for that purpose. The inadequacy and imperfection of this system was largely responsible for the destruction by fire of a large portion of the City in 1906. The City turned its attention to the water supply of the distant Sierra Nevada mountains where there was a relatively abundant supply of water due to heavy snowfall in the winter. The Tuolumne River rises and flows through the Hetch Hetchy Valley in the mountains. Much of this water had been appropriated by irrigators in the San Joaquin Valley, but a large volume of water in the spring run-off flowed into the sea with little benefit, and considerable damage to riparian owners along the river. The proposed plan was to impound this surplus water in the Hetch Hetchy Valley by a large dam and to pay a part of the huge cost [2] of the impounding and transmission of the water for nearly 200 miles by the development and sale of electric energy. The Act required the City to both develop and sell electric energy. Raker Act, Sec. 9 (l), (m), (n), (o). The immediate requirement of the City was the acquisition of a dependable water supply which would permit the legitimate growth of the City. The development and sale of electrical energy was a purely incidental matter.

At the time the Raker Act was passed there was not only a distributing system for water already installed in the City by a water company, but also there were two systems for the distribution of electric energy, one owned by the Pacific Gas & Electric Company, hereinafter referred to as "the Company", and the other by the Great Western Power Company. As much of the water of the Tuolumne River was required for irrigation and could be stored by the City for only a limited period, and as the electricity could not be stored, it was evidently within the contemplation of the Raker Act that some means for distributing the water and the electric energy should be provided. Either the systems already existing should be used or new systems to be constructed by the City or by someone authorized to use the streets for such purpose. At that time, and at present, the City was committed by its charter (Ch. 2, Art. 12, Charter of 1900; Sec. 119, Charter of 1935) to a general policy of public ownership of all public utilities.[3]

Nothing whatever is said in the Raker Act with reference to the acquisition or construction of a distributing system within the City for either water or electric energy, although the Act required the construction of a dam and an electric generating plant. The omission of such provision is significant, not only because of the fact that such a system was obviously necessary, but also because the cost thereof was so great as almost to equal, if not to exceed, all the other costs involved in the undertaking.

municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it or him by the said grantee * * *."

[2] The report of the Committee to Congress, contained the following estimate of cost: "The power potentiality of the stream is estimated at 115,000 horsepower in its ultimate development. It is proposed to develop this energy in 10,000 horsepower units, and use the power for public purposes in San Francisco and adjoining cities. * * *

"The ultimate cost of the project is estimated at $77,000,000. The initial cost for the first installation necessary to bring 200,000,000 gallons of water to the city is $37,500,000."

[3] "It is hereby declared to be the purpose and intention of the people of the City and County that its public utilities shall be gradually acquired and ultimately owned by the City and County of San Francisco."

The City, under the terms of the Act, has constructed dams and reservoirs for the impounding of water at such elevations above the city that by releasing the water from the reservoirs a large amount of electric power can be developed, as required by the Act. The City has constructed plants at Moccasin Creek and at Early Intake for the generation of power. The power generated from the water stored in Lake Eleanor and impounded by the Lake Eleanor dam was used by the City during the construction of the Hetch Hetchy dam, but is now available for distribution by the City.

In the original plan submitted to Congress it was contemplated that the water from the Hetch Hetchy reservoir would be pumped over the Coast Range and that a large part of the electric energy developed at the Moccasin plant would be utilized for that purpose. Consequently, at the time the plan was conceived and presented to Congress the disposition of surplus power other than that used by the City for municipal purposes, was a problem of minor importance. A change was made in the plan whereby the City drove a water level tunnel under the Coast Range and thus released a large amount of electric energy developed by the project for distribution and sale by the City. The Company had available to the people of San Francisco a complete distributing system for serving the people of the City with electric energy. The City completed the power line from its power generating plants on the Hetch Hetchy project toward San Francisco only as far as Newark. Although the City had no distributing lines or system and had not completed its transmission lines beyond Newark, it had constructed its power plants and had impounded water sufficient to generate a large amount of electric energy which would be wholly lost if the water, as it passed through the dam and canals of the Hetch Hetchy project, were not utilized for that purpose. In this situation, on July 1, 1925, a contract was entered into between the City and the Company providing for the distribution, through the facilities of the Company, of the electric energy generated at the Moccasin power plant of the Hetch Hetchy project. In entering into this contract, both parties were fully advised of the terms of the Raker Act and the restrictions contained in Section 6 thereof.

The claim of the United States is that the disposition of electric energy by the contract of July 1, 1925, is a sale of energy to the Company for resale purposes and, consequently, it is a violation of Section 6 of the Raker Act. It is also contended that even if the contract be construed as an agency agreement there is still a violation of the Raker Act by the City since it is claimed there was granted to the Company for a consideration the right as agent to sell the energy.

The City, on the other hand, contends that the contract between it and the Company was an agency contract whereby the Company was employed as agent of the City to distribute the electric energy for it and that such an agency contract does not violate Section 6 of the Raker Act.[4]

The contract, in brief, provides that the City employs the Company as "temporary distributor" for the City of all the electric energy generated at the Moccasin Power House (up to the maximum of 70,000 kilowatts, 3 phase, 60 cycle alternating current of approximately 105,000 volts) at not to exceed a 75 per cent monthly load factor, to distribute the same for municipal, industrial and domestic purposes, furnishing all step-down and stand-by services and metering and collecting from consumers. The charges to consumers are not to exceed lawfully established rates. The electric energy is to be delivered into the system of the Company at Newark and transmitted by the Company to San Francisco. Transmission losses from Newark to San Francisco, amounting to 24 per cent, are to be deducted in estimating the amount of energy delivered. Receipts from the consumers is estimated at 2.383 cents per kilowatt hour (which was the actual average revenue for the year 1924, the year preceding the year that the contract went into effect) and from this sum the Company is to deduct 73.065% as compensation covering its operating expenses and use of capital and to remit the remaining 26.935% to the City. The contract also provides that the return to the City should be proportionately changed in event of increases or decreases in the rates. Under the contract, the Company is bound to make payment for energy the City could have delivered at Newark, under the terms of contract, regardless of its acceptance and use by the Company.

---

[4] The City has made other contentions which, in view of the conclusions of this Court, are not necessary to consider.

■■ The intention of the parties as expressed in the contract of July 1, 1925, was to create an agency agreement. It was the deliberate purpose of the parties to avoid making a sale and to avoid a transaction which could be construed as a sale of electric energy by the City to the Company. The contract was drawn with that purpose and intent. It is conceded that the terminology used in the contract is that appropriate to an agency and not to a sale. In the contract it is stated that "the City hereby employs the Company and the Company accepts employment as temporary distributor for and in behalf of the City, of the electric energy to be generated at Moccasin Power House and transmitted to Newark by the City over its own transmission lines." And the energy is referred to as being "consigned and delivered" at Newark to the Company "for transmission and distribution to consumers" in San Francisco. Although the mere terminology used in a contract will not necessarily determine its character, the court should give effect to the expressed intent of the parties unless the electric energy is actually sold to the Company. That is, the intent of the parties to create an agency should be given effect unless they have so bargained that the ownership of the electric energy actually vested in the Company under the contract.

We are not dealing with a case where third persons have relied upon the apparent ownership and control of personal property in extending credit or in acquiring an interest in the property. Decisions dealing with such problems are not germane. No such reliance or detriment by the United States is shown because of the existence of the claimed agency agreement in the case at bar.

The United States, in support of its contention that the agreement was one of sale, makes the following contentions in respect to provisions of the contract which, it claims, shows a sales agreement: The Company has exclusive control over the energy once it enters the system of the Company at Newark; deduction of 24 per cent of the energy delivered at Newark does not show that the risk of loss was on the City as would be the case in an agency agreement; the price received by the City for electric energy under the contract is in practice fixed without direct relation to the actual revenue received from its sale to consumers; the City is assured of payment and the Company bound to pay for the electric energy specified in the contract without regard to acceptance or use; the rates charged to consumers are not fixed by the City but by the State Railroad Commission; the electric energy is disposed of by the Company to its usual customers in the normal course of its retail trade; the Company is the sole creditor named in the statements rendered to consumers for electric energy originating at Hetch Hetchy; moneys collected by the Company are not segregated with regard to the portion deemed attributable to power produced at Hetch Hetchy; the Company does not account to the City on the sales of electricity to consumers; the City is itself a purchaser from the Company of electric energy, part of which originates at Hetch Hetchy; the contract is terminable by either the City or the Company upon one day's notice and subject to cancellation by the parties upon request of the Secretary of the Interior upon his determination that the agreement violates the Raker Act.

Upon analysis it is clear that these points upon which the United States relies do not show that there is vested in the Company such rights to the electric energy as to constitute a sale of it to the Company regardless of the expressed intention of the parties to create an agency agreement for the transmission of the electric energy.

■ To say that the Company has exclusive control over the energy once it enters its system at Newark is to overlook the factual situation in regard to the transaction. What loss of control amounts to in this case is merely that the City delivers the electric energy to lines of the Company at Newark. Generation and consumption of the electric energy are simultaneous. The City generates the power and controls the power plant. The ultimate consumer obtains the electric energy by turning his switch, plugging his socket, or pushing a button, etc. Thus, to compare the control of the electric energy by the Company during the time of its transmission (about 1/4650 of a second) with the control of an agent or wholesaler of ordinary merchandise is to overlook what actually takes place in the transmission of the energy. The only control of the Company is that it controls its distribution facilities. But its duty to serve the public is fixed by law. There is nothing in the element of control of the distributing system pointing to a sale. The arrangement made was a practical method of utilizing a public utility

corporation as an agent to distribute power generated by the City to its customers in the city.

■ As to the deduction of 24 per cent of the Hetch Hetchy electric energy as delivered at Newark, we agree with the United States, that it has no bearing one way or the other on the question of passing of title to the energy as it was a deduction computed on average loss. Actually it was not a loss at all in the economic sense. The so-called loss was energy expended in the act of transmission. It was necessarily used for that purpose.

■ The fact that the price which the City receives is in practice fixed, without reference to all the possible variances in receipts, has no weight as indicating a sale. The formula used in arriving at the price to be received by the City was based on actual receipts of the Company for the sale of electric energy in 1924. The parties to the contract provided for a change of the amount to be received by the City in case of a change in the rates. That neither of the parties have thought it expedient to take advantage of this provision of the contract is beside the point. The method chosen was clearly a reasonable and practical arrangement for compensation of an agent. There is and could be no secret agreement between the parties supplanting or supplementing the contract in question.

■ One of the points mainly relied upon by the United States as showing a sale is the fact that the City is assured of payment and the obligation of the Company to pay for the electric energy delivered at Newark is unconditional. But in view of the circumstances of this case, where the amount of electric energy supplied did not fill the requirements of the Company, this provision merely amounts to an agreement by the Company to dispose of the City's electric energy ahead of its own and a guarantee of disposition of all energy supplied under the contract.

■ The contention of the United States that because the rates prescribed by the contract were not to exceed the lawfully established rates (i.e., those fixed by the Railroad Commission) a sale is shown, is clearly without merit.

The contention is that the contract between the City and the Company does not fix the rates to be charged to the consumer, that the City had power to fix such rates as to electric energy owned and distributed by it and that the fact that the power to fix the rates was conferred upon the Company by the City indicates a sale of electric energy to the Company. In support of this contention it is claimed that the provision in the contract that the rates should not exceed the maximum rates fixed by law, that is, by the Railroad Commission, allowed the Company to charge any rates less than the maximum thus prescribed and therefore permitted the Company to exercise a right of ownership of the electric energy delivered to it by the City. The Company has charged the rates fixed by the Railroad Commission and the conduct of the parties and the eighth covenant of the contract providing for a change of the Company's compensation in the event of a change in rates indicate that it was the intent of the parties that these maximum rates should be charged to the consumers until changed by competent authority. There is no delegation by the City in the contract to the Company of any power to fix the rates to the consumer and if the City had the power to fix the rates by reason of its ownership it still retains that power unless it be assumed that the contract is one of sale instead of agency, which is the very point in dispute.

■ The fact that the Company disposes of the energy to its usual customers, that the Company is the sole creditor named in the statements of account, that moneys collected by the Company are not segregated and that the Company makes no accounting of its sales to consumers is of little importance as showing a sale under the circumstances of this case. Here a public utility corporation is one of the contracting parties and a city the other. A practical method was adopted in arriving at its compensation to be paid for transmission and for the use of the Company's facilities. Assuming that the parties could make an agency agreement for distribution of the electric energy, it was open to them to contract in any manner they could agree upon. The contention of the government that all the proceeds of the sales by the Company belong to the Company begs the question. There is no provision of the contract to that effect. Nor does the fact that the City paid for Hetch Hetchy electric energy delivered to it by separate account at higher rates after it had been stepped down in voltage and converted in frequency, indicate a sale. This was a

practical method of balancing the accounts between the parties and of compensating the Company for services performed in changing the character of the electricity and transmitting it to various points of municipal usage.

The fact that the parties may terminate the contract upon one day's notice or upon request of the Secretary of the Interior does not indicate intent of the parties to make a sale.

We conclude that there was no sale made by the City to the Company of the electric energy distributed to the customers in San Francisco and that the contract was one by which the City employed the Company to transmit the City's power to the consumers thereof in the City.

The contention of the United States that the Raker Act forbids the City from contracting with a private company for the distribution of the electric energy by such company as agent for the City is clearly without merit. There is nothing in Section 6 of the Act prohibiting the City from distributing the energy by an agent. It is elementary, of course, that a sale by an agent is the sale of the principal.

We conclude that the City did not violate Section 6 of the Raker Act by making a sale of electric energy to the Company.

At the argument before this court it was pointed out to counsel that Section 6 of the Raker Act does not, by its terms, prohibit the City from making a sale of the water or energy for resale purposes but, rather, prohibits the City from "selling or letting * * * the right to sell" such water or energy. (See note 1) The United States contended at the hearing and in its opening brief that what was prohibited by Section 6 was a sale for resale purposes. This was not disputed by appellant in its briefs. The court is inclined to the view that Section 6 could not be so construed. It is inclined to believe that a sale of the "right to sell" water or electric energy is distinct from a sale of such water or energy and that Section 6 of the Raker Act only prohibited the sale of the "right to sell" to a corporation or person to whom the water or electric energy had been sold. The right to collect compensation for use of water in California is a franchise. The water itself is not owned or sold, it is the usufruct thereof that is capable of private owner-

ship. Constitution of California, Art. XIV, §§ 1, 2. The right to use the streets to distribute electric energy to inhabitants of a municipality is a franchise and the right to distribute such energy is subject to regulation and permission by the Railroad Commission. See, Oro Electric Corp. v. R. R. Comm., 169 Cal. 466, 147 P. 118; Section 50, Public Utilities Act, St.Ex.Sess., 1911, p. 43. As a sale by the City to the Company of electric energy could not invest the Company with the right to sell such energy, the court views it as doubtful whether or not the City has violated the Raker Act even if the contract of July 1, 1925, constituted a sale of electric energy to the Company to be resold by it to the inhabitants of the City.

It must be assumed, of course, that Congress, in enacting the Raker Act, understood the full legal effect of its words, "selling or letting * * * the right to sell". Montclair v. Ramsdell, 107 U.S. 147, 2 S.Ct. 391, 27 L.Ed. 431. We called for briefs on the subject.

The City, in its brief submitted after the argument, contends that Section 6 of the Raker Act prohibits a sale of electric energy for resale. It states: "The government and the municipality are agreed that Section 6 prohibits sale for resale."

The United States, in its brief submitted after argument, states: "The thing prohibited is a grant by the City to a private individual or corporation which will carry with it the right, either as owner or agent, to sell water or energy delivered to such individual or corporation by the City."

It concedes, however, that the Act "did not prohibit employment of an agent for transmission purposes".

In view of the position of the City that the Act prohibits a sale for resale, we base our decision upon the sole ground that the contract between the City and the Company was an agency agreement and not a contract of sale.

As to the contention of the United States, reasserted and amplified in its brief after argument, that the terms of Section 6 prohibit not only a sale for resale but the creation of an agency by the City for disposition of the energy on its behalf, it is sufficient to point out that what we have already said disposes of this question. We point out further, however, that there are no words contained in Section 6, supra,

that are appropriate to prohibit such an arrangement. The United States relies much on the fact that Section 6 prohibits not only "selling" the "right to sell" but also prohibits "letting" that right. But the term "letting" in Section 6 obviously means leasing. This is clear by the use of the word "to" between the word "letting" and the words "any corporation" in the section. (See note 1).

The decree of the District Court is reversed with instructions to dismiss the complaint which does not state a cause of action.

For disqualification subsequent to submission, Judge DENMAN did not participate in the consideration or decision of this case.